## ARKANSAS AMUSEMENT CORPORATION v. KEMPNER et al.

### No. 9258.

Circuit Court of Appeals, Eighth Circuit.

Feb. 26, 1932.

G. B. Rose, of Little Rock, Ark. (L. M. Rice, of Dallas, Tex., and Ben D. Brickhouse, L. L. Brickhouse, D. H. Cantrell, J. F. Loughborough, A. W. Dobyns, and A. F. House, all of Little Rock, Ark., on the brief), for appellant.

Joe T. Robinson and Harry E. Meek, both of Little Rock, Ark. (C. H. Moses and J. W. House, Jr., both of Little Rock, Ark., on the brief), for appellees.

Before KENYON, VAN VALKENBURGH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This action was brought by Ike Kempner in the United States District Court for the Eastern Division of Arkansas to recover salary claimed to be due him by virtue of a certain written contract made on the 20th day of July, 1925, between Southern Enterprises, Inc., of Texas, Little Rock Amusement Company, and Kempner. The Little Rock Amusement Company was engaged in the movie picture business in Little Rock, Ark., owning or controlling in 1925 practically all the movie theaters in that city. The Arkansas Amusement Corporation (appellant) is corporate successor to the Little Rock Amusement Company and assumed the obligations of the contract upon which this suit is based.

The jury returned a verdict for Kempner in the sum of $17,595.95, for which amount judgment was entered against appellant. Since the submission of this case Kempner has died and A. J. Kempner and Stella Kempner, administrators of his estate, have been substituted as appellees.

A number of corporations appear as parties to the various contracts in evidence. We shall designate them as follows: Southern Enterprises, Inc., as the Southern Company, Little Rock Amusement Company as the Little Rock Company, Arkansas Enterprises, Inc., as the Arkansas Company, Arkansas Amusement Corporation as appellant. Southern Enterprises, Inc., was a subsidiary of Famous-Players Lasky Corporation.

We quote from the contract of July 20, 1925, as follows:

"Whereas, by a contract dated as of December 29th, 1923, between Southern, Saul S. Harris, Kempner and Little Rock (hereinafter called the contract of December 29th, 1923) by paragraph numbered 5 thereof, Little Rock agreed to employ Kempner at a salary of $10,000 a year, for a period of fifteen (15) years from and after June 28, 1924, or so long as Kempner should live, whichever period should be the shorter, with a provision providing for the purchase of Class A capital stock of Little Rock by Southern from the estate of Kempner in accordance with the provisions of said paragraph; said contract containing other terms; and

"Whereas, Kempner desires to sell and Southern desires to buy the Class A capital stock of Little Rock (being the number of one thousand (1,000) shares and/or all or any right or interest therein possessed by Kempner, in accordance with the provisions of this contract; and

"Whereas, the parties hereto desire to terminate, cancel and render void and of no effect the provisions of paragraph No. 5 of the contract of December 29, 1923, except as expressly stated herein."

Section 1 of said contract provides for the sale by Kempner to the Southern of his 1,000 shares of class A capital stock of Little Rock for the sum of $100,000, payable in different installments running over a period of time ending April 20, 1931.

Section 2 is the cause of this lawsuit. It is as follows: "Little Rock agrees to employ Kempner either as Vice-President or, at its option, in other executive capacity, for the period between the date of this contract and November 1, 1939, and Kempner agrees to accept said employment and to give to Little Rock and its affairs such of his time, attention and services as it requests of him. Little Rock agrees to pay to Kempner in return for said services salary at the rate of Eight Thousand ($8,000) Dollars a year from the date hereof to November 1, 1939, and said salary to be paid in weekly installments of One Hundred Firty-three Dollars and Eighty-five cents ($153.85) each."

Southern Company guaranteed to Kempner the faithful performance on its part of the undertaking. This contract cancels certain provisions of a contract of December 29, 1923. We quote from the latter as follows:

"Agreement between Southern Enterprises, Inc. of Texas, a Texas corporation (hereinafter called 'Southern'), Saul S. Harris, 'of Little Rock, Arkansas (hereinafter called 'Harris'), Ike Kempner, of Little Rock, Arkansas (hereinafter called 'Kempner'), Arkansas Enterprises, Inc., a Delaware corporation (hereinafter called 'Arkansas') and Little Rock Amusement Company, a Delaware Corporation (hereinafter called 'Little Rock'), made and executed as of the 29th day of December, 1923.

"Whereas, by a contract between Southern, Kempner and Harris, made in the year 1920, (hereinafter called the '1920 contract') it was agreed that Arkansas should be formed and that various leases upon theatre properties situated in the City of Little Rock, Arkansas, should be transferred to it, Arkansas assuming the payment of certain amounts specified therein; and. * * *

"5. Little Rock shall pay Kempner salary at the rate of Ten Thousand ($10,000) Dollars per year for a period of fifteen years from June 28, 1924, or so long as he shall live, whichever period is the shorter—such salary to be paid weekly. At any time after the death of Kempner (if such event shall happen before fifteen years from June 28, 1924) if Little Rock is unwilling to pay, or to continue to pay, Abe or Dave Kempner, of Little Rock, Arkansas, brothers of Kempner, salary at the rate of Ten Thousand ($10,000) Dollars per year until the expiration of fifteen years from June 28, 1924, for the performance of the same services that Kempner is to perform hereunder, the Estate of Kempner may elect to sell to Southern, and it will buy, Class 'A' capital stock of Little Rock belonging to said Estate, and Southern will upon such election pay for said capital stock the sum of One Hundred Thousand ($100,000) Dollars which the number of years and fraction thereof between the date of this agree-

ment and the date of a written notification to it of said election bears to fifteen years."

Also: "Kempner, Harris and Southern agree that said bonus and debts specified in this Article (4), and any interest accrued thereon, are hereby cancelled and discharged."

Under this contract Little Rock assumed the liabilities of the Arkansas Enterprises, Inc., with some exceptions set forth in section 4 thereof, among which were the payment of $7,500 due Kempner for moneys advanced to the Arkansas Company, and bonus or rentals due Kempner and Harris, as specified in article 6 of the 1920 contract, made between Southern Company of the first part, and Kempner and Harris of the second part. This contract of 1920 provided for formation of a new corporation to take over the movie picture theatres in Little Rock, 50 per cent. of the stock to be owned by Southern Company and 50 per cent. by Kempner and Harris. The name of the new company was "Arkansas Enterprises, Inc." Section 6 of the contract, referred to in the 1923 contract, is as follows: "It is understood and agreed that the Second Party shall receive from the said new corporation as a bonus or rental the sum of Twenty Thousand ($20,000.00) Dollars per year, payable quarterly in advance, for a period of ten years, without interest, and that the first party shall advance, as of August 1st, 1920, in behalf of the said new corporation the first two and one-half (2½) year's bonus or rental, aggregating Fifty Thousand ($50,-000.00) Dollars, which is to be re-paid to the First Party with Six Per Cent interest thereon by the new corporation out of the earnings, and the First Party may negotiate loans for and in behalf of the said new corporation to reimburse the First Party for the said Fifty Thousand ($50,000.00) Dollar advancement, until the earnings of the new corporation shall pay the same." This contract provided that Kempner should receive a salary of $50 per week as president of the corporation.

Four or five theaters owned by Kempner and Harris and two owned by the Southern Company were put into the new corporation, Arkansas Enterprises, Inc., and the bonus that Kempner and Harris were to receive from the new corporation ($20,000 per year for ten years) was to equalize their contribution to the new holding company with that of the Southern Company. They were paid in cash $50,000 at the time of the transaction. This section of the contract of 1920 provided for the amount Kempner claims he released, together with an indebtedness to him on ac-

count of cash advanced to the Arkansas Company, as a consideration for the salary of $10,000 provided in the 1923 contract for a period of fifteen years. Kempner in the meantime had acquired Harris' interest in the bonus.

September 28, 1927, an agreement was made between the Southern Company, owners of all the capital stock of the Little Rock Company, and Wertheimer and Rowley, who owned and controlled all of the outstanding stock of the Home Amusement Company, and who were operating the Palace Theatre in Little Rock, whereby there was a consolidation of the movie picture houses in Little Rock under the Arkansas Amusement Corporation, appellant, and Wertheimer and Rowley took over the 1925 contract from Little Rock Company in behalf of said corporation, which was organized when they purchased their interest from the Southern Company. Kempner had no stock in this company. The theater properties of the Southern Company and Little Rock Company in the city of Little Rock were transferred to it. Rowley was secretary and general manager of this company and Wertheimer occupied an executive position. In this contract of September 28, 1927, it is recited, section 22: "22. Wertheimer and Rowley each for himself agrees that he has personal knowledge of and has examined and is fully familiar with the provisions of a certain agreement dated July 20th, 1925, made by and between Southern Enterprises, Inc. of Texas, Little Rock Amusement Company, and I. Kempner, wherein and whereby I. Kempner has been employed by Little Rock, either as Vice President, or, at the option of Little Rock, in any other executive capacity, for a period beginning July 20, 1925, and ending November 1, 1939, at an annual salary of $8,000.00, payable in weekly installments of $153.85 each, and that in the event of I. Kempner's death occurring prior to November 1, 1939, Little Rock shall pay to the Estate of I. Kempner said salary so long as Dave or Abe Kempner, brothers of I. Kempner, perform services for Little Rock which I. Kempner performs, and said contract is hereby accepted in all its terms and conditions by Wertheimer and Rowley and to be performed by Little Rock."

The situation in brief presented by these various contracts is this: The 1920 contract provided for a bonus to Kempner and Harris of $20,000 per year for ten years. Under it, as president of the Arkansas Enterprises, Incorporated, Kempner had a salary of $50 per week. The 1923 contract provided for the

Little Rock Company assuming all the liabilities of the Arkansas Company with certain exceptions, among which was the bonus provided in the contract of 1920, and $7,500 advanced by Kempner to the Arkansas Company. Under this Kempner was to have a salary of $10,000 a year for fifteen years. The services he was to perform were not specified. The 1925 contract provided for Kempner selling his class A stock in Little Rock Company to Southern Company for $100,000. Kempner was to be employed by Little Rock Company as vice president or in other executive capacity at $8,000 per year for the period between July 20, 1925, and November 1, 1939. The 1928 contract took over in behalf of appellant the contract of 1925 and assumed the liabilities thereunder. It recites that Wertheimer and Rowley, officers of appellant, were fully cognizant of the provision in the contract of 1925 for salary to be paid Kempner.

In 1928, Messrs. Rowley and Wertheimer, as officers of and on behalf of appellant, requested Kempner to give said corporation his active co-operation and counsel, and urged him to attend their daily meetings in which general matters looking to the interest of the enterprise were discussed. In a letter to him of February 23, 1928, signed by Wertheimer, it is said:

"It is our desire, and we so urge upon you to attend our daily meetings in which these matters are discussed and give us the benefit of your advice and suggestions to help us actively in the conduct of these theatres. * * *

"Please attend the meeting Friday, at which meeting we will be glad to go into these matters in detail with you, and to lay out and plan the work. If for any reason it will be impossible for you to attend Friday, then, let's be sure and have your presence at our meeting Saturday. Something has to be done, and the sooner we get together the better for the theatres."

February 24, 1928, Kempner answered objecting to the hour set for the meeting.

In the letter to Kempner of March 6, 1928, signed by Rowley as secretary and manager of appellant, it is said: " * * * We feel in view of the existing contract with us that you should give us the benefit of your active services for the eight thousand dollars a year, and with your past success as a guide, we think that your services should be beneficial to the Arkansas Amusement Corporation. This is a very vital period in the affairs of the Arkansas Amusement Corporation and we must insist that you attend our meetings at eleven o'clock every morning in the office of the Capitol Theatre. We regret that this hour is a little inconvenient for you, but it is about the only hour of the day that we can devote to executive meetings, as you well know operators of the theatres have to be around their theatres late at night." To this Kempner replied on March 9, 1928, objecting to the hour at which the meetings were to be held, but stating he would be glad to attend them.

June 6, 1928, Rowley wrote Kempner as follows:

"Mr. Ike Kempner, care of Gus Blass Company, Little Rock, Arkansas.

"Dear Mr. Kempner: In regard to our personal conversation of June 4th, in which we advised that after taking over the Theatres now owned by the Arkansas Amusement Corporation and in going over the various matters concerning that company we find there is a contract existing with you which obligates this company to pay you a salary of eight thousand dollars per year, payable weekly for which the contract states you are to render services of an executive nature when called upon. This letter is to confirm our conversation above mentioned whereby we informed you that you were expected to report at this office June the 18th to comply with your contract. With best wishes and kindest regards, we are

"Very truly yours,
"Arkansas Amusement Corporation,
by E. H. Rowley."

To this Kempner replied on June 11th as follows:

"Mr. E. H. Rowley, City.
"Dear Sir: I am in receipt of yours of the 6th instant and am always glad to have you take up with me any matters relating to the theatre situation here in the city. As I have told you previously, I have at all times, and will continue to do so in the future, fully complied with my contract with the Famous Players. We had a definite understanding as to just what service I was to render, which is covered by my contract with them. You know that I was to do everything I could to protect the theatres' interest, to look after the matter of their taxes, questions of public policy, and serve them in any reasonable executive capacity. This I am glad to do, and my office and my time are at your disposal whenever you find that I can be of any benefit to the theatres you control. You understand, of course, that my contract was direct with

Famous Players and if I should receive a letter from them asking that I report to your office for any particular reason, I will be glad to do so, and, if you need me for any particular reason, on the day of June 18th, I will be glad to come by your office and render you any assistance that I can.

"Yours very cordially, Ike Kempner."

December 11, 1928, Rowley wrote Kempner:

"December 11th, 1928.

"Mr. Ike Kempner, care of Gus Blass Company, Little Rock, Arkansas.

"Dear Sir: This will advise you that on Thursday morning at nine-thirty o'clock there will be a very important executive meeting of the staff of the Arkansas Amusement Corporation. This meeting will be held in the office of the manager of the Capitol Theatre and I ask that in compliance with the terms of your employment contract with this company that you kindly be present.

"Yours very truly,

"[Signed] Arkansas Amusement Corporation,

"By E. H. Rowley, as Manager."

Kempner in reply to this request wrote Rowley on December 12, 1928:

"Mr. E. H. Rowley, City.

"Dear Sir: Your letter of December the 11th received and in reply will state it will be a pleasure for me to attend your executive meeting at nine-thirty o'clock on Thursday morning next. This is not in compliance with the terms of my employment contract as I have no such contract with your company, but if I can be of any service will be glad to attend this meeting."

On February 6, 1929, on behalf of appellant, Rowley wrote Kempner as follows:

"Mr. Ike Kempner, Little Rock, Arkansas.

"Dear Sir: Your letter of December 12, 1928, in regard to salary contract with the Arkansas Amusement Company, in answer to my letter to you of December 11, received and on account of having been out of the city a great part of the time I have been unable to take action upon same. Quoting from the second paragraph of your letter," quoting, "'This is not in compliance with the terms of my contract as I have no such contract with your company, but if I can be of any service will be glad to attend this meeting.'" quotation ends—"Inasmuch as you have repeatedly refused to render any service to the Arkansas Amusement Company and now state that you have no employment contract with this company, you are hereby notified that no fur-

ther payments will be made to you upon salary account.

"Yours very truly,

Arkansas Amusement Corporation, by E. H. Rowley."

Kempner refused to accept this as final and advised appellant he would take the matter up with "the parties who understand this contract." Mr. Keough, counsel for the Publix Theatres Corporation, which owned the stock of the Southern Company, which in turn owned one-half of the stock of appellant, wrote Mr. Rowley as follows:

"October 15, 1928.

"Mr. E. H. Rowley, Arkansas Amusement Corporation, Capitol Theatre, Little Rock, Arkansas.

"My dear Mr. Rowley:

"In re: Little Rock, Arkansas.

"Referring to my talk with you about compensation to Mr. Ike Kempner under his employment contract, please advise me if Mr. Kempner fails or refuses to perform the executive services required under his contract, in which case we will stop payment of his salary, because it was never intended that he should draw a salary and do nothing for it.

"Best regards,

"Yours very truly, Austin C. Keough."

Payment of Kempner's salary ceased after February 2, 1929.

This rather extended statement of facts seems necessary to the understanding of a somewhat involved situation.

Appellant's claim is that Kempner breached the contract by refusing to perform certain services requested of him. Appellees contend the services requested were not embraced within the intended meaning of the contract of 1925.

The question in this case is whether Kempner refused to perform duties required of him under that contract, so the query arises, What were those duties? Appellees claim the contract is ambiguous as to this, and that parol evidence is admissible to clear up the ambiguity. The trial court agreed with this. The case was tried on that theory, and a large amount of evidence was introduced.

Kempner sued on this same contract in 1929 in the circuit court of Pulaski county, Ark., to recover his weekly salary installments. Judgment was rendered in his favor, parol evidence being received to explain the alleged ambiguity. The case was appealed to the Supreme Court of Arkansas, which held that the contract was not ambiguous, and that parol evidence should not have been ad-

mitted. The judgment was reversed and the case remanded. Arkansas Amusement Co. v. Kempner, 182 Ark. 897, 33 S.W.(2d) 42, 43. It was then dismissed in the state court, and this action brought in the federal court.

The Supreme Court of Arkansas in its opinion, after referring to the rule in Arkansas that parol evidence could be introduced of negotiations leading up to the making of a contract as well as the relation of the parties thereto and attendant circumstances to aid in explaining ambiguities in the writing, said: "We are unable to discover any ambiguity in the contract as to the nature and character of services appellee bound himself to perform. In just so many words he obligated himself in payment of a stated salary for a definite period to perform any executive function the company would request him to perform. Executive functions have relation to the management of all or some part of a business and imply activity. An executive officer or employee is one who assumes command or control and directs the course of the business, or some part thereof, and who outlines the duties and directs the work of subordinate employees. Such functions are easily and readily distinguishable from routine work and ordinary labor required in the conduct of a business. It was the duty of appellee under the wording of the contract to perform any executive function connected with the picture show business which appellant should call upon him to perform. Appellee cannot be heard to say, as he attempted to do in the trial of the cause, that his duties were to be perfunctory or nominal and that his position was to be that of a sinecure." Also: "The trial court told the jury that the contract was ambiguous and directed them to interpret its meaning with respect to the kind of services appellee was to perform; whereas, he should have instructed them that it was the duty of appellee to perform any services of an executive nature connected with the picture show business when requested to do so and that he could not recover if he failed or refused to perform such duties."

It thus appears that the Supreme Court of Arkansas and the trial court in this case differ on the question as to whether this contract is ambiguous and subject to explanation by parol evidence.

The paragraph of the contract of 1925, the obligations of which were assumed by appellant, claimed to be ambiguous, is the one in which Little Rock "agrees to employ Kempner either as Vice-President or, at its option, in other executive capacity." The term "am-

biguous" means doubtful and uncertain. In Bouvier's Law Dictionary 117 defines ambiguity: "Duplicity, indistinctness, or uncertainty of meaning of an expression used in a written instrument." In Kilby Mfg. Co. v. Hinchman-Renton Fire Proofing Co., 132 F. 957, 961, this court said: "In the absence of fraud, accident, or mistake, all prior parol negotiations are, as a general rule, merged in the written contract of the parties. No representation, promise, or agreement made or opinion expressed in their previous conversations is admissible to contradict, explain, or modify the plain provisions and just interpretation of their written agreement. * * * But where, in the application of a contract to its subject-matter, an ambiguity or uncertainty arises which cannot be removed by an examination of the agreement alone, parol evidence of the circumstances under which it was made and of statements made in the negotiations which preceded it may be admitted to resolve the ambiguity, and to prove the real intention of the parties."

In Merriam v. United States, 107 U. S. 437, 441, 2 S. Ct. 536, 540, 27 L. Ed. 531, it is said: "It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made."

See also Rucker v. Bolles (C. C. A.) 133 F. 858; J. I. Case Threshing Mach. Co. v. Buick Motor Co. (C. C. A.) 39 F.(2d) 305. The law is well settled. The difficulty is in its application. The contract in question is to be read in the light of what the parties intended as gathered from the language thereof in view of all the surrounding circumstances. If in so doing the intention of the parties is reasonably clear, there is no ambiguity.

As to the term, "vice president," as used in the phrase we are discussing, there could be no ambiguity, for the by-laws of Little Rock defined the duties of the vice president. Section 2 of article 5 thereof is as follows:

"(2) Vice-President: The Vice President shall, in the absence or disability of the President, perform the duties of the President. (The control of the policies, operation, business and management of the theatres, the policy of which is controlled by this Corporation, shall at all times be vested in the Vice President.) There shall, however, be no change in the policy of the operation of any theatre, the policy of which is now or here-

after controlled by this Corporation, without the consent, in writing, first obtained, of each of the holders of shares of each class of its capital stock.

"The Vice President shall perform such other duties as may from time to time be imposed upon him by the board."

The duties of the president were defined by section 1 thereof as follows: "(1) President: The President shall preside at all meetings of the stockholders and board of directors and, subject to the provisions of Section (2) of this article, shall see that all orders and resolutions are carried into effect and, subject to the approval of the board of directors, he, or in case of his absence or disability, the Vice President, shall execute all bonds, mortgages and other contracts and instruments, provided, however, that the same shall be attested by the Treasurer."

If Kempner had been called on to perform the duties of vice president, as defined by the by-laws, he could not have declined to do so on the plea that he never intended for a salary of $8,000 per year to give the necessary time to the company to carry on such duties, that he understood the vice presidency was merely a nominal position and he would not have entered into a contract which required him to devote a substantial part of his time thereto, that in fact he had purchased the position by paying a large sum therefor, and his duties were merely nominal. He had agreed to accept such employment as vice president if the company conferred such honor upon him, and its duties were made clear in the by-laws.

The question, we think, is narrowed to whether the phrase, "in other executive capacity," in connection with the provision, "to accept said employment and to give to Little Rock and its affairs such of his time, attention and services as it requests of him," is ambiguous.

Appellees' theory is that the provision as to giving attention and services as requested of him is redundant, and the paragraph, it is claimed, may logically be epitomized as follows: "Little Rock Amusement Company employs Kempner either as Vice President or, at its option, in other executive capacity, and Kempner accepts such employment." We know no reason why the phrase "to give to Little Rock and its affairs such of his time, attention and services as it requests of him" should be eliminated from the contract. It cannot be cast aside as superfluous. It is part of the written words and it tends to make

fairly certain the work Kempner was to do. The services in an executive capacity were to be only when requested, which implies at least that they were not to be steady or continuous, and of course such requests must be reasonable. Counsel for appellees argue that, if the phrase, "to accept employment in an executive capacity," were clear and unambiguous, it would justify a holding that, if Kempner's agreement was "to do work" for Little Rock Company with no further amplification of his duties, that would be clear and unambiguous. If Kempner had agreed "to do such work for the Little Rock Company as the Company should call on him to do," we do not think there would be any ambiguity in the expression. Here Kempner was to act in an executive capacity if the company desired it and to do such work in that capacity as he should be called on to do by the corporation. He had agreed to the company's exercise of discretion in calling on him for the performance of duties "in other executive capacity" than that of vice president. Counsel concedes in its argument that a contract might be drawn where a man could bind himself to perform on request of his employer any service in a given business that came under the classification "executive capacity." It would seem that is about what was done here.

We are not convinced there is any particular ambiguity about the phrase, "in other executive capacity," when taken in connection with the other language of section 2. "Executive capacity" is a reasonably well-understood term. Duties in such capacity relate to active participation in the control, supervision, and management of the business. Doing routine menial labor is not acting in an executive capacity. As the Supreme Court of Arkansas said in its opinion: "Such functions are easily and readily distinguishable from routine work and ordinary labor required in the conduct of a business." Rowley testified there was nothing in the "duties of an executive of the moving picture business that a man of ordinary business ability could not master in two or three weeks."

It is argued that, if the contract means that Kempner was compelled to perform any requested act that could be termed "executive," it would lead to such an absurdity as to make the contract ambiguous, and the well-reasoned case of Klueter v. Joseph Schlitz Brewing Co., 143 Wis. 347, 128 N. W. 43, 32 L. R. A. (N. S.) 383, is cited as authority. Of course the words used in a contract, while not ambiguous in the abstract, may, when considered in relation to the circumstances sur-

rounding the making of the same, create an ambiguity requiring interpretation. That is clearly reasoned out in Klueter v. Schlitz Brewing Co., supra.

■ Is it unreasonable and absurd, however, to expect that Kempner, for a salary of $8,-000 per year, would perform such services in an "executive capacity" for appellant in connection with its movie picture business in Little Rock as might be reasonably requested of him?

It may have been foolish for him if he did so agree, in view of his numerous activities, but foolish things are frequently done by wise people. It is true, as appears from the evidence, that Kempner was a very prominent man in Little Rock. He was connected with a bank, was general manager of the Gus Blass Company; owned a couple of shoe stores, and had large business interests. He testifies he could not have accepted a position paying the salary specified in the contract if it would require any considerable portion of his time. Had he been elected vice president of Little Rock Company, he certainly could have been called on to do the work of that position as defined by the by-laws, and that might have required substantial portions of his time. $8,000 per year may be an insignificant salary in the movie picture industry, but it would in most lines of business and professional life be regarded as rather substantial and as requiring some quid pro quo. Certainly such salary is not so small even in case of a man with the supposed influence of Kempner and the many business demands upon him as to be ridiculous and in itself make the contract providing for the same ambiguous.

If it could be fairly considered that the contract at issue was ambiguous, in that it did not clearly and definitely show the nature of the services Kempner was to perform, we do not see that the evidence admitted to explain it accomplished that purpose. The contracts of 1920 and 1923, which were admissible as interwoven with the contract sued on and as part of the history of the transactions between Kempner and the various companies, give no assistance in explaining the term "executive capacity."

Under the 1920 contract between the Southern Company and Harris and Kempner, under which Harris and Kempner were to receive a bonus, Kempner, as president of the new company, Arkansas Enterprises, Inc., was to receive a salary of $50 per week, and was to "use his best endeavors at all times to further the interests of the said new corporation."

Under the contract of 1923 between Southern Company, Arkansas Company, Little Rock Company, Harris and Kempner, it was provided that Kempner should receive a $10,000 salary for fifteen years, and, in case of his death before that time, one of his brothers should receive the salary "for the performance of the same services that Kempner is to perform hereunder," but the contract does not say what that service is to be.

■ The proposed contract between the Famous-Players Lasky Corporation and Kempner dated June ——, 1924, makes offer as to salary for Kempner of $10,000 per year if he elects to sell certain of his stock to Southern Company, and he is to agree to "perform such reasonable services on behalf of the new company in an executive capacity as it calls on him to perform." This is substantially what is agreed to in the 1925 contract, and the same duties are to be enjoined upon his brothers in case of Kempner's death before the fifteen-year period expired.

The proposition made by Franklin, vice president of Famous-Players Lasky Company of October 2, 1924, relates to the release on the part of the Southern Company and Kempner and Harris of the amounts owing them by the Arkansas Company. The letter of the Southern Company to Kempner of date March 16, 1925, was, we think, erroneously admitted under any theory of the case. In referring to the change of salary to $8,000 per year at the time of purchase of Kempner's stock in Little Rock Company by Southern Company for the sum of $100,000, it says: "You shall continue to be an executive officer of the Company and your salary of $10,000.00 per year shall continue until date of sale, July first, 1925, and shall then be changed so that you shall receive salary of $8,000.00 per year from date of purchase until November first, 1939, said salary to be paid weekly. This $8,000.00 per year until November first, 1939, is to be considered part of the purchase price. You shall continue, in return for the salary which you receive, to perform such reasonable services for the Little Rock Amusement Company and Southern Enterprises, Inc., of Texas, in an executive capacity, as either of them shall call upon you to perform." This evidence tends to vary and not explain the written contract.

None of these contracts or letters throw a particle of light on the character of services

the parties to the 1925 contract intended Kempner to perform.

Kempner's own testimony does show his understanding of what he intended to do under the contract. Prior to the organization of appellant he had advised with the different companies with which he was connected, had looked after some tax matters, secured a theater site at Birmingham, Ala., helped to defeat a censorship bill in the Legislature of Arkansas. These were the kinds of duties he claims he was to perform. Kempner's testimony is to the effect that he really purchased the employment for $157,500 by releasing his claims against the Arkansas Company, and hence could do what he pleased therein, and that the job passed on to his brothers if he died within fifteen years. There is some inference from his testimony that the salary paid him was part of the purchase price of his stock in the Little Rock Company sold to the Southern Company. We refer more specifically to this claim that he bought a "soft position."

Under the contract of 1920 Kempner and Harris were to have a bonus of $20,000 a year for ten years from the new corporation, the Arkansas Company, which equalized with the Southern Enterprises their contribution to the new holding company. $50,000 of this was paid in cash at the time, leaving $150,000 balance. Each of the parties, Southern Company and Harris and Kempner, held 50 per cent. of the stock of this company. Mr. Franklin, vice president of the Arkansas Company, and president of Southern Enterprises, Inc., wanted to be rid of Harris, and told Kempner, if he could get Harris' interest, he would give him a contract of $15,000 per year for ten years.

When the contract of 1923 was made Little Rock did not assume the $150,000 provided for in article 6 of the contract of 1920, or the $7,500 advanced by Kempner to the Arkansas Company, and Kempner testifies that he agreed to forgive this debt of the Arkansas Company which otherwise would have been payable by the Little Rock Company, and that this was the basis and consideration of his salary provision in the 1923 contract. Kempner testified in regard to giving up the $157,500 claimed to be owing him by the Little Rock Company, "I agreed to that, provided I could buy a soft position with them, for which I was to pay a large amount of money." Kempner's testimony is somewhat confusing as to whether he was relying entirely on the fact that he had bought a soft position by discharging the obligations owing him by

Arkansas Company or whether he also considered that the salary to be paid him was a part of the purchase price of his stock in Little Rock Company sold to Southern Company. Of course the salary, if paid for the fifteen years, would exceed the purchase price of the stock. His letter to Keough, counsel of the Publix Theatres, referring to Rowley, states: "He does not appreciate the fact this salary was in reality a part the purchase price." Franklin, in his letter of March 16, 1925, offering to purchase of Kempner's stock in Little Rock Company, stated that this salary was "to be considered part of the purchase price." It is insisted, and was during the trial, that the contract sued on was one for employment, and that the salary payments were not purchase-money payments. After the introduction of the letter of March 16, 1925, to Kempner from Franklin counsel for Kempner stated: "Mr. Meek: I want to renew our statement—and I am glad to make it in the presence of the jury—that we do not offer any of this evidence for the purpose of transforming these salary payments into purchase-money payments. We admit this is a true employment contract and Kempner had to perform certain duties to get his salary. But those antecedent negotiations we offer in evidence, merely to throw light on what duties he was supposed to perform. In other words, we take the position that it is competent to introduce evidence to show that a man paid a hundred and fifty thousand dollars to get a job—because if he did pay a hundred and fifty thousand dollars to get a job the inference follows that it would be a job of rather light duties; it would be a job very favorable to the employe. And that is the theory on which we offer all this evidence."

The court instructed the jury that the question of whether the amount to be paid Kempner as a salary was a part of the purchase price of the stock he sold was not to be considered by them. That this evidence confused the jury is apparent. After considering the case for three days it returned into court and asked several questions of the court, one of which was this: "Has the Jury the right to consider the contract unbreakable because of the purchase price mentioned in the previous contract?" The jury apparently had in its mind that the salary to be paid Kempner might be part of the purchase price of his Little Rock Company stock, which view had some lodgment in the minds of Franklin and Kempner. The peculiar provision of the contract as to the salary being paid after Kempner's death to his brothers

is rather significant on this phase of the question. Evidence which tended to show that the Kempner salary was a part of the purchase price of his stock was inadmissible as tending to vary the terms of a written contract. Such evidence is the written proposal by Franklin to Kempner of October 2, 1924, and the letter of Franklin to Kempner of March 16, 1925. Under any theory of the case we think these documents were inadmissible. Most of this parol evidence, instead of explaining and clearing away the claimed ambiguity, tended merely to confusion. If Kempner purchased a "soft position," as he evidently considered he did, nevertheless he obligated himself to do certain things. If he had been elected to the vice presidency of the company, he would have had many duties to perform. He could not have determined arbitrarily what he would do. He is obligated to do what he contracted to do, whether the position be soft or hard, and regardless of what he paid for it.

This contract was not hastily entered into. Some months were devoted to its consideration. As a man of wide business experience it may be presumed he would not have entered into a contract which did not express the services he intended to perform. If he intended his services to be merely nominal while he was receiving $120,000 in salaries, he should have made such an unusual situation clear in the contract.

Wertheimer and Rowley in the contract of September 28, 1927, under which their liability arises by virtue of assuming the obligations of the contract of Little Rock with Kempner to pay the $8,000 salary, make the statement hereinbefore set forth that they have knowledge of the agreement of July 20, 1925, whereby Kempner has been employed by Little Rock at an annual salary of $8,000 per year as vice president or "in other executive capacity." It does not appear that they knew anything of any arrangement between Franklin and Kempner that he was to perform only nominal services, and that his position was to be one merely of dignified influence. They had a right to rely on the wording of the contract and to require from Kempner the services he agreed in the contract to perform.

It is contended that the construction the parties themselves placed on this contract is of vital importance as showing what the contract really was intended to do. Of course it is the well-established rule that: "Evidence of the practical construction given to an instrument of writing by the parties thereto may be admissible to explain its meaning when explanation is necessary. This rule does not, however, extend so far as to permit the overthrow of plain terms of a contract, and an unambiguous contract cannot be varied by evidence of a construction by the parties different from that which the language clearly imports." 22 C. J. 1180, 1181. There does not seem to have been any particular construction of this contract by the parties. No executive services were demanded of Kempner by appellant up to the time of the controversy as to attending meetings. In any event, if this contract is unambiguous, as we think it is, then the rule has no application.

It is our conclusion that Kempner bound himself under the contract in suit to serve the Little Rock Company as vice president or "in other executive capacity," and that he was compelled in carrying out his contract to perform such reasonable services in that capacity as the company required of him in connection with the picture theater business of appellant in Little Rock, and that under the contract it cannot be said that these duties were merely nominal. In instructing the jury that this contract was ambiguous, we think the learned trial court erred, and that appellant was entitled to an instruction that the contract was not ambiguous.

There is a question of fact for a jury as to whether Kempner refused to perform the duties which appellant requested of him as to attending meetings called to consider the business of the company. Requests made of Kempner to perform services in an executive capacity must of course be reasonable and not made unnecessarily or merely for the purpose of harassing him. The good faith of such requests and whether he had reasonable and legitimate excuses not to respond are proper subjects for the consideration of the jury on the question of whether Kempner had in fact breached this contract. In view of our conclusion that the contract is not ambiguous, our discussion of the evidence introduced has probably been unnecessary, but we thought it advisable so to do, as it seemed to us that, even if this contract could be considered ambiguous, the case would have to be reversed because considerable of the evidence which we have heretofore referred to tended to vary the terms of the written contract. The judgment is reversed, and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

Reversed and remanded.