## C. & A. CONSTRUCTION COMPANY, Inc.
## *v.* BENNING CONSTRUCTION COMPANY

73-296                                    509 S.W. 2d 302

Opinion delivered May 20, 1974

*Rose, Nash, Williamson, Carroll & Clay*, by: *H . Dane Clay* and *Webster L. Hubbell*, for appellant.

*Coleman, Gantt, Ramsay & Cox,* for appellee.

FRANK HOLT, Justice. The appellant and appellee are subcontractors who entered into an agreement involving the installation of sewer lines. Paragraph 7 of the agreement between these parties provided:

It is further agreed that the 2nd subco tractor will

receive $20,000 for supervision which will be added to the actual cost figure. It is further agreed that the difference between actual cost and bid price will be divided as follows: 33 1/3% to 2nd contractor; 66 2/3% to 1st subcontractor.

Appellee was paid $517,451.11 and appellee brought suit for an alleged payment deficit of $55,243.20 on the contract. The trial court, sitting as a jury, after hearing parol evidence, awarded appellee judgment for $40,349.11. Appellant questions only that part of the judgment which awarded $18,-600 (in addition to $20,000 for supervision) for the salary and living expenses of appellee's president and sole stockholder during the time he was personally engaged in the supervision of the construction. Appellant contends that the extra award of $18,600 is double recovery in that it is contrary to the terms of the contract which designates a specific sum of $20,000 for supervision.

When contracting parties express their intention in a written instrument in clear and unambiguous language, it is our duty to construe the written agreement according to the plain meaning of the language employed. *Miller* v. *Dyer,* 243 Ark. 981, 423 S.W. 2d 275 (1968). However, where the meaning of a written contract is ambiguous, parol evidence is admissible to explain the writing. *Brown and Hackney* v. *Daubs,* 139 Ark. 53, 213 S.W. 4 (1919). Ambiguities are both patent and latent. When, on its face, the reader can tell that something must be added to the written contract to determine the parties' intent, the ambiguity is patent; a latent ambiguity arises from undisclosed facts or uncertainty of the written instrument. *Dorr* v. *School District No. 26 &c,* 40 Ark. 237 (1882); *Johnson* v. *Mo. Pac. R. R. Co.,* 139 Ark. 507, 214 S.W. 17 (1919); and *Taylor* v. *Union Sawmill Co.,* 105 Ark. 518, 152 S.W. 150 (1912). However, the initial determination of the existence of an ambiguity rests with the court and if ambiguity exists, then parol evidence is admissible and the meaning of the term becomes a question for the factfinder. *Fort Smith Appliance and Service Co.* v. *Smith,* 218 Ark. 411, 236 S.W. 2d 583 (1951); *Brown and Hackney* v. *Daubs, supra;* and *Easton* v. *Washington County Insurance Co.,* 391 Pa. 28, 137 A. 2d 332 (1957), cited in 4 Williston on Contracts, § 627 (3d. Ed. 1961). For example, in *Taylor* v. *Union Sawmill Co., supra,* our court made an initial determination of the ambiguous nature of the term "white oak" before justifying the introduction of testimony of custom and usage in order to determine the sense in which the term was employed.

In the case at bar, we cannot strain the plain, obvious, and unambiguous language of the contract. Appellee agreed to a definite amount for supervision. Had appellee's president and sole owner of the corporation desired that the sum of $20,000 represent a guaranteed profit, as he and his witnesses so understood from their verbal agreement during negotiations, the wording of the contract should have so indicated. Had appellee's president and owner intended, as he now contends was their verbal understanding, that his salary should be in addition to the $20,000 for supervision, the written contract could easily have so reflected. The lower court's award for salary ($15,500) is contrary to the plain and unambiguous terms of their written agreement and the judgment should be adjusted accordingly.

In *Hoffman* v. *Late*, 222 Ark. 395, 260 S.W. 2d 446 (1953), we said:

> It is the accepted present-day view that the parol evidence rule is not really a rule of evidence but is instead a rule of substantive law. Wigmore on Evidence (3d. Ed.), § 2400; Williston on Contracts (Rev. Ed.), § 631; Rest., Contracts, § 237; 4 Ark. L. Rev. 168. As Wigmore puts it, *supra:* 'What the rule does is to declare that certain kinds of facts are legally ineffective in the substantive law; and this of course (like any other ruling of substantive law) results in forbidding the fact to be proved at all.' The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing.

> Hence in the case at bar it makes no difference whether Late's version of the oral negotiations is true or false. . . .

Likewise, in the case at bar, even though the verbal evidence and tentative drafts attending the negotiations be true, it cannot alter the terms of the clearly unambiguous written agreement as to his compensation for supervisory services. The contracting parties were knowledgeable and certainly capable of reducing their negotiations to unambiguous written terms. In such situations, we cannot interfere.

The court found that appellee was entitled to $3,100 for its owner's expenses during the time he actually was "on the job." The contract clearly provides for recovery of actual

costs. In the circumstances, the court was justified in this award.

We deem it unnecessary to discuss appellant's other contentions.

The judgment is modified to exclude the salary allowance.

Affirmed as modified.

FOGLEMAN and BROWN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. The majority opinion is apparently based upon the premise that the existence of ambiguity must be determined by the court upon the basis of an examination of the contract. This is the case in determining whether there is a patent ambiguity. It is not in the case of a latent ambiguity. By definition, a latent ambiguity is one which does not appear upon the face of the instrument and cannot be detected by examination of the document. It arises from facts not disclosed in the instrument. *Dorr* v. *School District No. 26*, 40 Ark. 237. Latent ambiguity is defined at 3A C.J.S. P. 409, Ambiguity, as follows:

> The term has been said to imply either, on the one hand, a concealment of the real meaning or intention of the writer which does not appear on the face of the words used, until these words are brought in contact with collateral facts or until the facts are shown, or, on the other hand, a clear expression of the party's intention, and the existence of a doubt not as to the intention, but as to the object to which the intention applies.

> The term "latent ambiguity" is defined to mean an ambiguity which arises not upon the words of the instrument, as looked at in themselves, but upon those words when applied to the object or subject which they describe. It is one which does not appear on the face of the language used or the instrument being considered, or when the words apply equally to two or more different subjects or things, as where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or evidence aliunde, creates a necessity for interpretation or a choice among two or more possible meanings.

It has been said that a latent ambiguity occurs where a writing appears on its face clear and unambiguous, but which, in fact, is shown by extrinsic evidence to be uncertain in meaning, or where a description, apparently plain and unambiguous, is shown to fit different pieces of property.

In order for the court to determine whether a latent ambiguity exists, it is obviously necessary that it consider evidence of extraneous and collateral facts as to extrinsic circumstances. *Logan* v. *Wiley*, 357 Pa. 547, 55 A. 2d 366 (1947). It is a well settled rule that extrinsic evidence is admissible to show that a latent ambiguity exists. *Hall* v. *Equitable Life Assurance Society*, 295 Mich. 404, 295 N.W. 204; *McCarty* v. *Mercury Metalcraft Company*, 372 Mich. 567, 129 N.W. 2d 854 (1964); *Widney* v. *Hess*, 242 Iowa 342, 45 N.W. 2d 233 (1951). See *Ellege* v. *Henderson*, 142 Ark. 421, 218 S.W. 831; *Easton* v. *Washington County Insurance Co.*, 391 Pa. 28, 137 A. 2d 332. In treating the matter as it relates to the parol evidence rule, the author of Jones on Evidence (Vol. 3, p. 134, § 16:23) says:

In a preceding section it has been pointed out that where a written instrument appears to be complete on its face, a presumption will be indulged that the parties have included all of the terms of their agreement in the instrument.

While for all practical purposes, if such a presumption is indulged, it will have a conclusive effect to prevent bringing in additional terms, it does not have the effect of barring disclosure of hidden uncertainties, and to this extent the presumption is rebuttable and parol evidence admissible not only to bring out the latent ambiguity but to explain the true intent of the parties and to resolve the uncertainty, if it can be resolved, in order to save the contract.

To discover a latent ambiguity, it is proper to go outside the instrument to ascertain whether the words used aptly fit the facts existing when the instrument was executed and the words used. *Widney* v. *Hess*, supra; *Queens Insurance Company of America* v. *Meyer Milling Co.*, 43 F. 2d 885 (8th Cir. 1930).

It is generally held that the question whether an ambiguity exists is one of law for the court. *Steele* v. *McCargo*, 260 F. 2d 753 (8th Cir. 1958); *Easton* v. *Washington County Insurance*

*Co.*, supra. In determining whether an ambiguity exists, a contract must be read in the light of what the parties intended as gathered from the language thereof in view of all surrounding circumstances. *Arkansas Amusement Co.* v. *Kempner*, 57 F. 2d 466 (8th Cir. 1932). See *Ellege* v. *Henderson*, supra; 17A C.J.S. 37, Contracts, § 294b(3) P. 37. The words of a contract, which are not ambiguous in the abstract, may, when considered in relation to the circumstances surrounding the making of it, create an ambiguity requiring interpretation. *Arkansas Amusement Co.* v. *Kempner*, supra; *Paepcke-Leicht Lbr. Co.* v. *Talley*, 106 Ark. 400, 153 S.W. 833. See *Ellege* v. *Henderson*, supra; *Easton* v. *Washington County Insurance Co.*, supra. In making the determination, courts may acquaint themselves with the persons and circumstances that are the subjects of the statements in the written agreement and place themselves in the position of the parties who made the contract, so as to view the circumstances as they did. *Wood* v. *Kelsey*, 90 Ark. 272, 119 S.W. 258.

There is another facet of the problem of admissibility of parol testimony to explain a contract very closely related to the question whether a latent ambiguity exists. Our cases clearly recognize that parol evidence is admissible to explain the meaning of the terms or words used when they have a technical meaning or, by custom and usage are used in a sense other than in an ordinary meaning of the words. *Paepcke-Leicht Lbr. Co.* v. *Talley*, supra; *Wilkes* v. *Stacy*, 113 Ark. 556, 169 S.W. 796. In the case last cited, we quoted from Lawson on Contracts, Second Edition, § 390, p. 450, as follows:

> The customs of particular classes of men soon give to particular words different meanings from those which they may have among other classes, or in the community generally. Mercantile contracts are commonly framed in a language peculiar to merchants, and hardly understood outside their world. Agreements which are entered into every day in the year between members of different trades and professions are expressed in technical and uncommon terms. The intentions of the parties, though perfectly well known to themselves, would be defeated were the language employed to be strictly construed according to its ordinary meaning in the world at large. Hence, while words in a contract relating to the ordinary transactions of life are to be construed according to their plain, ordinary and popular

meaning, yet if, in reference to the subject-matter of the contract, particular words and expressions have by usage acquired a meaning different from their plain, ordinary and popular meaning, the parties using those words in such a contract must be taken to have used them in their peculiar sense. And so words, technical or ambiguous on their face, or foreign or peculiar to the sciences or the arts, or to particular trades, professions, occupations, or localities, may be explained, where they are employed in written instruments, by parol evidence of usage.

Obviously, the trial court found that an ambiguity existed. The pertinent contract terms hang upon the meaning of the words "supervision" and "actual cost." The real issue is whether the salary and expenses of Benning while he was acting as superintendent of the Crossett job are a part of the "actual costs" as distinguished from the allowance of $20,000 for "supervision." Benning testified that the charge in question covered only the time he spent on the North Crossett job, and that appellee employed no superintendent on the job, although there were four working foremen. It is significant that appellant thought that evidence of the original negotiations was admissible, because its attorney introduced evidence thereof by cross-examination of Benning over appellee's attorney's objection that it should be considered for impeachment only.

There was evidence that the following circumstances existed at the time the contract being construed was entered into:

Sutton Construction Company had failed. A representative of appellant had prepared a contract relating to unfinished sewer jobs at Hope and McGehee. Benning agreed with the two persons then representing appellant that he would not charge any of his time to these two jobs, but that it would be charged for the North Crossett job, which apparently had not been commenced by Sutton. Benning told the interested parties how much salary he was drawing ($300 per week) and that he was drawing $50 per week as expenses, which he said was to be charged to the Hope and McGehee jobs. According to Benning, it was agreed that he was to get a guaranteed profit of $20,000 on the

North Crossett job and one-third of any profit, and his salary to be charged to the job was not included in the $20,000 figure. The first estimate made by appellee included two $20,000 items, one for profit and the other for supervision. On most construction jobs the size of the North Crossett job there is a construction superintendent. The original contract required that a construction superintendent or foreman *who had full authority* to act for the contractor be employed *at the site.*

Carrie New testified that he was familiar with the custom in the construction business as to whether the managing executive of a company is entitled to charge his salary to the job in addition to a fixed fee for supervision. He stated that the practice is that when the contract is let on a cost-plus fixed fee basis, the fee is over and above all job costs, which include office overhead, executives' salaries, general contractor's labor, material and all subcontract costs. Normally, he said, a corporation would have an office staff and executive officers, and the duties of the latter may vary in that they double as superintendents, estimators, expediters and purchasers. In a small organization, he said that one man may act as all these. He was present when the final draft of the contract was made and did not understand that the $20,000 figure therein was to be for Benning's salary and expenses, but did understand that was a fee to be paid over and above any profit or whether any profit was realized or not. John W. Cole, Jr., appellee's attorney at the drafting, was not familiar with usage in the construction field, but had the same understanding as New as to the $20,000. He recalled that there was discussion directed at the amount of Benning's personal salary and stated that it was agreed that the $20,000 payment would not be a substitute for it. A portion of the stated contract form of the American Institute of Architects for use when cost of work plus a fixed fee forms the basis of payment was introduced as an exhibit. It contained a clause under the heading of "Costs to be Reimbursed" providing for payment of salaries of the contractor's employees stationed at the field office in whatever capacity employed.

The contract in question was not abstracted but the paragraph in question is stated thus:

It is further agreed that 2nd Subcontractor will receive

$20,000.00 for supervision which will be added to actual cost figure. It is further agreed that the difference between actual cost and bid price will be divided as follows: 33-1/3% to 2nd Subcontractor; 66-2/3% to 1st Subcontractor. (Plaintiff's Exhibit No. 2)

It must be noted that the payment of this $20,000 was to be made to appellee, a corporation, and not to Benning. Appellant's attorney emphasizes the fact that this language constituted a change of the same paragraph in the next preceding draft in that it was therein provided that "the 2nd Subcontractor will, nevertheless, receive the sum of $20,000 for his supervisory services."

I do not see how we can say the court erred in holding that the contract was ambiguous in view of the surrounding circumstances and collateral facts. If it was ambiguous, then we only have to determine whether there is any substantial evidence to support the judgment, since the judge also sat as the jury, and the question was for the jury. *Ft. Smith Appliance & Service Co.* v. *Smith*, 218 Ark. 411, 236 S.W. 2d 583; *Bailey* v. *Sutton*, 208 Ark. 184, 185 S.W. 2d 276; *Paepcke-Leicht Lbr. Co.* v. *Talley*, 106 Ark. 400, 153 S.W. 833.

Once it was shown that there was a latent ambiguity or that the words used by the parties were commonly accorded a meaning different from their ordinary meaning, oral evidence was admissible to explain them. *Ft. Smith Appliance & Service Co.* v. *Smith*, supra; *Paepcke-Leicht Lbr. Co.* v. *Talley*, supra; *Ellege* v. *Henderson*, 142 Ark. 421, 218 S.W. 831. Evidence of the way in which a particular term is understood commercially, or in a particular trade or business is admissible, as is evidence of custom and usage, including local popular and general use. *Paepcke-Leicht Lbr. Co.* v. *Talley*, supra; *Taylor* v. *Union Sawmill Co.*, 105 Ark. 518, 152 S.W. 150; *McCarthy* v. *McArthur*, 69 Ark. 313, 63 S.W. 56; *Jackson County Gin Co.* v. *McQuistion*, 177 Ark. 60, 5 S.W. 2d 729; *Davis* v. *Martin Stave Co.*, 113 Ark. 325, 168 S.W. 553. Testimony of the parties as to the meaning of the terms is also admissible. *Ellege* v. *Henderson*, supra. Parol evidence is also competent to explain the situation and relation of the parties and the surrounding circumstances at the time of the execution of the contract. *Clear Creek Oil & Gas Co.* v. *Bushmaier*, 165 Ark. 303, 264 S.W. 830.

The matter is treated in the Uniform Commercial Code.

See Ark. Stat. Ann. § 85-1-205 (Add. 1961). A usage of trade in the vocation or trade in which the parties are engaged or of which they should be aware gives particular meaning to and supplements or qualifies terms of an agreement. Ark. Stat. Ann. § 85-1-205(4). An applicable usage of trade in the place where any part of performance is to occur shall be taken into consideration as to that part of performance is to occur shall be taken into consideration as to that part of performance. A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. Ark. Stat. Ann. § 85-1-205(2), (5). The committee comments are particularly enlightening. In part, they are:

> This Act rejects both the "lay-dictionary" and the "conveyancer's" reading of a commercial agreement. Instead the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances. The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing.

> \* \* \*

> This Act deals with "usage of trade" as a factor in reaching the commercial meaning of the agreement which the parties have made. The language used is to be interpreted as meaning what it may fairly be expected to mean to parties involved in the particular commercial transaction in a given locality or in a given vocation or trade. By adopting in this context the term "usage of trade" this Act expresses its intent to reject those cases which see evidence of "custom" as representing an effort to displace or negate "established rules of law."

> \* \* \*

> A usage of trade under subsection (2) must have the "regularity of observance" specified. The ancient English tests for "custom" are abandoned in this connection. Therefore, it is not required that a usage of trade be "ancient or immemorial," "universal" or the

like. Under the requirement of subsection (2) full recognition is thus available for new usages and for usages currently observed by the great majority of decent dealers, even though dissidents ready to cut corners do not agree.

See also, 17 Am. Jur. 2d 643, Contracts, § 251.

In addition to the evidence set out above, there was other substantial evidence in appellee's favor. Benning testified he spent 95% of his time on the North Crossett sewer job. Carrie New said that Benning acted as construction superintendent on the North Crossett job and that he knew of no other person employed in that capacity.

It is true that there is also evidence from which a contrary result might have been reached, but this does not affect the substantiality of the evidence to support the conclusion reached by the court sitting as a jury. I would affirm the judgment.

I am authorized to state that Mr. Justice Brown joins in this dissent.