Ronnie FLOYD and Jennie Floyd *v.* OTTER CREEK
HOMEOWNERS ASSOCIATION

CA 87-208                                    742 S.W.2d 120

Court of Appeals of Arkansas
Division I
Opinion delivered January 6, 1988

32

*A. Wayne Davis*, for appellant.

*Wright, Lindsey & Jennings*, by: *Steven W. Quattlebaum*, for appellee.

GEORGE K. CRACRAFT, Judge. Ronnie and Jennie Floyd appeal from an order of the Pulaski County Circuit Court

dismissing their action to recover sums paid by them to the Otter Creek Homeowners Association and enjoin collection of additional sums. They contended that the payments were made pursuant to an illegal assessment levied by the board of directors of the association. The issues appealed and the bases for our resolution of them can best be brought into focus by a recitation of the circumstances leading up to this appeal.

Appellants became members of the homeowners association by virtue of their purchase of a residence in the Otter Creek Subdivision. All deeds in Otter Creek contained mutual covenants as to the rights and obligations of homeowners and established a board of directors for the conduct of affairs of the association. Section 1 of the agreement obligated the property owners to pay annual assessments and special assessments as determined in accordance with the remainder of the agreement. In pertinent part, the parties agreed as follows:

> *Section 3. Annual Assessment.* Until January 1 of the year immediately following the conveyance of the first lot to any Owner, the initial annual assessment shall be Two Hundred Forty Dollars ($240.00) per Lot or $240.00 per dwelling unit whichever is greater.

* * *

> (a) From and after January 1 of the year immediately following the conveyance of the first Lot to an Owner, the initial annual assessment may be increased each year not more than ten per cent (10%) above the assessment for the previous year *without a vote of the membership.*

> (b) From and after January 1 of the year immediately following the conveyance of the first lot to an Owner, the initial annual assessment may be increased above ten per cent (10%) by a vote of two-thirds (⅔) of the votes cast by all members who are voting in person or by proxy, at a meeting duly called for this purpose.

* * *

> (c) The board of directors of the Association may set the annual assessment from time to time as they see fit.

*Section 4. Special Assessments for Capital Improvements.* In addition to the annual assessments authorized above, the Association may levy in any assessment year, a special assessment applicable to that year only for the purpose of defraying, *in whole or in part*, the cost of any construction, reconstruction, repair or replacement of a capital improvement upon the Private Common Areas including fixtures and personal property related thereto, provided that any such assessment shall have the assent of the members entitled to cast 2/3 of all votes of members who are voting in person or by proxy at a meeting duly called for that purpose.

* * *

*Section 6. Notice and Quorum for any Action Authorized Under Sections 3 and 4.* Written notice of any meeting *called for the purpose of* taking any action authorized under Section 3 or 4 of Article IV shall be sent to all members not less than thirty (30) days nor more than sixty (60) days in advance of the meeting. No quorum shall be required at such meeting, provided, however, those members present in person or proxy must approve the action taken by 2/3 of the votes present in person or proxy. [Emphasis added.]

* * *

In February of 1985, the board of directors, without a vote of the membership, adopted a resolution to increase the annual assessment by less than ten percent for the purpose of maintaining capital improvements located on the grounds owned by the property owners in common. Following Section 3(a) of the covenants, no notice of a meeting was given to property holders. The appellants paid the increased assessment for five months and then brought this action in the municipal court of Little Rock, Arkansas, to recover the sum of $12.50 already paid to the association and enjoin the collection of any future installments of the assessment. Appellants contended that the board of directors had no authority to raise the annual assessment for the purpose of making or maintaining capital improvements without a vote of two-thirds of the members at a meeting called for that purpose.

The municipal court entered judgment in favor of the appellants and an appeal was taken to the circuit court of Pulaski County.

The circuit court held that the pertinent provisions of the declaration were ambiguous and permitted parol evidence to explain the intent of the parties. The court then rejected appellants' contention that Section 4 of the agreement was the exclusive means for raising funds with which to construct or maintain capital improvements, held that such improvements could be financed in whole or in part from funds derived from the annual assessment without notice to or a two-thirds vote of the members of the association, and dismissed the complaint. The appellants contend that the trial court erred in holding that the homeowners association could increase and use annual assessments for maintenance or construction of capital improvements without thirty days notice to and a vote of the homeowners, and that the court erred in allowing parol evidence because that portion of it relied upon by the court in resolving the ambiguity was in fact erroneously admitted in that it permitted the court in its construction of the contract to consider prior negotiations not included in the contract.

We agree that in some circumstances the admission of parol evidence concerning prior negotiations regarding a provision which may have been inadvertently omitted from the final draft would be improper. However, in view of the approach we take of the case, any error that may have been committed was harmless. In reaching our conclusion, we apply three well-established principles of contract law. First, where the terms of a contract are ambiguous and capable of having more than one meaning, extrinsic evidence is permitted to establish the intent of the parties, and the meaning of the contract then becomes a question of fact. *C & A Construction Company, Inc.* v. *Benning Construction Co.*, 256 Ark. 621, 509 S.W.2d 302 (1974); *Don Gilstrap Builders, Inc.* v. *Jackson*, 269 Ark. 876, 601 S.W.2d 270 (Ark. App. 1980). However, when a contract is free of ambiguity, its construction is a matter of law for the court to determine. *West* v. *Todd*, 207 Ark. 341, 180 S.W.2d 522 (1944); *Pittsburg Steel Co.* v. *Wood*, 109 Ark. 537, 160 S.W. 519 (1913); *Geurin Contractors, Inc.* v. *Bituminous Casualty Corp.*, 5 Ark. App. 229, 636 S.W.2d 638 (1982). Finally, different clauses of a contract must be read together and the contract construed so that

all of its parts harmonize, if that is possible. Giving effect to one clause to the exclusion of another on the same subject, where the two are reconcilable, is error. A construction which neutralizes any provision of a contract should never be adopted if the contract can be construed so as to give effect to all its provisions. *Continental Casualty Co. v. Davidson*, 250 Ark. 35, 463 S.W.2d 652 (1971). In *Fowler v. Unionaid Insurance Co.*, 180 Ark. 140, 144-145, 20 S.W.2d 611, 613 (1929), our supreme court said:

> It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement. In fact, it may be said to be a settled rule in the construction of contracts that the interpretation must be upon the entire instrument, and not merely on disjointed or particular parts of it. The whole context is to be considered in ascertaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause. Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument. The contract must be viewed from the beginning to end, and all its terms must pass in review, for one clause may modify, limit or illuminate the other. Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized, if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. [Citation omitted.]

When we apply these rules by considering the language of the entire policy and giving legal effect to all of the language used and the object to be accomplished by the contract, we find no ambiguity.

Section 3(a) provides that the board of directors may declare an increase in annual assessments without a vote of the members of the association provided the increase does not exceed ten percent. Here, the increase was less than ten percent. Section 3(b) permits the board of directors to increase the annual assessment by more than ten percent but only upon a vote of two-thirds of the members of the association who are voting in person or by proxy at a meeting called for that purpose. Section 4 authorizes the board to levy a special assessment to defray, in whole or in part, the cost of construction, reconstruction, repair, or replacement of capital improvements, provided that two-thirds of the members vote in person or by proxy at a meeting called for that purpose. We find nothing in these provisions which would support the construction that the funds raised by assessments under Section 3(a) could not be used for capital improvements or that Section 4 provided the only means by which those funds could be obtained.

■ Sections 3(a) and (b) place no limitations upon the uses to which funds assessed under those sections can be put. Section 4 provides that, "[i]n addition to" the annual assessments, the association "may" levy special assessments for the purpose of defraying "in whole or in part" the cost of construction of capital improvements. The use of the word "may" indicates an intent that Section 4 provide merely an alternative means of raising funds, and the phrase "in whole or in part" would be meaningless if the construction urged by the appellants was adopted. It is clear that the drafters intended that the cost of a capital improvement might be defrayed entirely by special assessment but not necessarily so. It is clear from the provision that funds raised pursuant to assessments under Section 4 could be used along with other funds where necessary to make the capital improvements. Otherwise, we would have to read out of the provision of Section 4 the words "in whole or *in part*." We conclude that the intent of Section 4 is to provide an alternative and additional means of raising money to pay for all or part of some unusual or special expense, and that it contemplates that funds derived from other sources might be used in part to defray those specific expenses. We can find no manifestation of intent to limit the use of funds raised through a Section 3(a) assessment to any particular purpose or that Section 4 was to provide the exclusive means of raising funds for capital improvements.

■ Nor can we agree with the appellants that Section 6 requires that all of the members be given written notice of action taken by the board under Section 3(a). Section 3(a) expressly provides that the board may increase the annual assessments by not more than ten percent without a vote of the membership. To require notice of a meeting to act on a matter in which the members had no voice would not only be meaningless but would neutralize Section 3(a). Sections 3(b) and 4 require meetings in order to transact business authorized under those sections. Section 6 requires that members be given notice of any meeting *called* pursuant to Sections 3 and 4, provides the manner in which that notice is to be given, and again declares that the action taken by the board must be approved by a vote of two-thirds of the members present. Here, no meeting was or was required to be called, and, therefore, no notice could logically have been required. When these sections are read together, it is clear that Section 6 has no application to Section 3(a) but simply provides the type of notice required for those meetings called for the purposes set forth in Sections 3(b) and 4, which require approval of the membership.

■ Although the trial court erred in finding this contract to be ambiguous and in basing its construction upon oral testimony which therefore should not have been admitted, we conclude that he did declare the proper construction to be given to this contract. Under our established rule that we will not reverse a decision of the trial court if the correct result is reached, even if that decision was based upon the wrong reasoning, we affirm. *Worthen Bank & Trust Co. v. Adair*, 15 Ark. App. 144, 690 S.W.2d 727 (1985).

Affirmed.

COULSON and COOPER, JJ., agree.