Willie Earl JOHNSON, Jr. and Murphy CARROLL
*v.* STATE of Arkansas

CR 82-29                                    632 S.W.2d 416

Supreme Court of Arkansas
Opinion delivered May 10, 1982

*Haskins & Wilson,* by: *John W. Achor,* for appellant Johnson.

*John A. Crain,* for appellant.

*Frank H. Bailey* of *Bailey & Paden, P.A.,* for appellee.

LAWSON CLONINGER, Judge. Appellee Richard L. Burnett is a former stockholder of Saltzman-Guenthner Clinic, Ltd., the appellant corporation. Appellee alleged in his complaint that under the terms of his employment with appellant corporation, the stock he owned should be redeemed at book value. Appellant counterclaimed, alleging that appellee had breached his employment contract by engaging in competition with appellant and that appellee had been overpaid.

The trial court found that the term "book value" as used in the employment contract was not ambiguous, as urged by appellant, and that parol evidence was not admissible to vary the terms of the written agreement; that in the absence of qualification or limitation of the written employment agreement, all assets of the corporation, including accounts receivable, are to be considered in determining book value; that the acts of appellee did not constitute competition with the business of appellant; and that the evidence was insufficient to show that appellee had been overpaid.

We affirm.

Appellant is a professional corporation formed to practice medicine and surgery, and appellee is a medical doctor. On April 1, 1977, the parties entered into an agreement, whereby appellee would devote his entire time to the business of appellant. Appellant has not furnished this court with a legible copy of the employment agreement, but from the legible portions of the agreement and the testimony

of the parties it is determined that the agreement provided as follows: Appellee was not to engage in any activity in competition with the business of appellant without the approval of appellant's Board of Directors; appellee was to be compensated with such salary and other compensation as fixed from time to time by the Board of Directors; either party could terminate the agreement by giving a 30-day written notice, which period could be shortened by agreement; and appellant agreed that in the event of termination of the agreement appellant corporation could make a 100% redemption of any stock owned by appellee "at the then book value of the stock."

Appellant's position is that the term "book value" is an ambiguous term, and appellant attempted to introduce evidence that "book value" as used in the agreement was understood by the parties to mean "assets less accounts receivable less liabilities."

When an ambiguity in a written instrument is alleged as foundation for the admission of parol evidence, the court is charged with the initial factual determination of the existence or nonexistence of ambiguity in the written agreement. *Gilstrap* v. *Jackson,* 269 Ark. 876, 601 S.W.2d 270 (Ark. App. 1980). If the court finds that the language used is ambiguous, it may then admit parol evidence to show that the language was intended to have any particular meaning that the words will reasonably bear. *Kerr* v. *Walker,* 229 Ark. 1054, 321 S.W.2d 220 (1959). If the court finds the language of the contract not ambiguous then parol evidence may not be admitted to prove that clear and unambiguous words were subjectively intended to have a meaning not fairly attributable to them. *Arkansas Rock and Gravel Co.* v. *Chris-T-Emulsion Co.,* 259 Ark. 807, 536 S.W.2d 724 (1976).

A trial court's finding of fact will not be reversed on appeal unless clearly erroneous, clearly against the preponderance of the evidence. Rule 52 (a), Arkansas Rules of Civil Procedure; *Winkle* v. *Grand National Bank,* 267 Ark. 123, 601 S.W.2d 559 (1980).

A number of courts in other jurisdictions have found

that the term "book value" has acquired an established meaning; it is the value of all the assets of the corporation as shown on its books less all of its liabilities. *Hollister* v. *Fiedler*, 86 A. 2d 809 (N.J. 1952); *Hagan* v. *Dundore*, 50 A. 2d 570 (Md. 1947); *Mills* v. *Rich*, 229 N.W. 462 (Mich. 1930). In *Bain and Company* v. *Deal*, 251 Ark. 905, 475 S.W.2d 908 (1972), the Arkansas Supreme Court quoted with apparent approval an excerpt from *Schumann* v. *Samuels*, 142 N.W. 2d 777 (Wis. 1966) which declared:

> The book value is not an arbitrary value that may be entered upon the books of the company but the value as predicated upon the market value of the assets of the company after deducting its liabilities.

In the instant case three certified public accountants presented evidence that the term "book value" unless qualified or used with modifiers, has a generally accepted meaning of assets minus liabilities, and that the "book value" of one share of stock is assets of the corporation, minus liabilities, divided by the number of outstanding shares. The employment agreement was on a form prepared by appellant, and appellant could have easily qualified or limited the meaning of the term if it so chose. The finding of the trial court that the term "book value" was not ambiguous is not clearly erroneous or clearly against the preponderance of the evidence.

Appellant was not entitled to present parol testimony to show the intent of the parties. The term "book value" used in the written agreement without limitation or qualification was not ambiguous. When the parties entered into the written agreement, all antecedent proposals and negotiations were merged into the written contract which cannot be added to or varied by parol evidence. *Hoffman* v. *Late*, 222 Ark. 395, 260 S.W.2d 446 (1953).

The trial court found insufficient evidence to prove that appellee had violated his agreement not to enter into competition with the business of appellant. We agree. There was evidence that appellee had purchased land on January 31, 1980 upon which to build his own clinic, and that

appellee's employment with appellant continued on until April 30, 1980. There is no evidence, however, that appellee treated any patients outside of appellant's clinic or performed any act in competition with appellant's business prior to his employment termination. There was evidence that in December of 1979 the doctor members of appellant's Board of Directors planned to form a partnership for the purpose of building a clinic which was to be leased to appellant corporation. Appellee had been invited to become a partner in the plan, but appellee had refused because of his disapproval of the land proposed to be purchased by the partnership. Neither the plan of the doctors to form a partnership nor appellee's purchase of land for a clinic had been approved by appellant's Board of Directors. The finding of the trial court that there was insufficient evidence to find that appellee had engaged in competition with appellant in violation of the agreement is not clearly erroneous.

The compensation of appellee was fixed by the Board of Directors of appellant corporation, as provided for in the parties' written agreement. If appellee has been overcompensated, which fact the evidence tends to support, it was occasioned by the action of appellant's Board of Directors. Appellant cannot now complain of the action of its Board.

Affirmed.

CORBIN, GLAZE and CRACRAFT, JJ., dissent.

TOM GLAZE, Judge, dissenting. I respectfully disagree with the majority decision. In affirming the trial court, we are permitting a result which was clearly not intended by either of the parties when they entered into their employment agreement. The majority has placed a construction on the parties' agreement which allows the appellee to purchase one hundred shares of stock at $300 and less than one year later, the appellant is required to repurchase these same shares for the sum of $9,316. This difference in amount is due solely to the fact that appellee originally purchased the one hundred shares based on a "book value" which did not include the accounts receivable owned by appellant. Thus,

we have the anomalous situation where appellee purchased shares of stock at a "book value" which did not include the asset of accounts receivable, but when he sold the shares, he did so at a "book value" which included accounts receivable. From the facts presented in this cause, I am convinced that this result was not intended by the parties. I am also persuaded that if the parties' agreement was properly construed in light of the rules set forth in *Les-Bil, Inc.* v. *General Waterworks Corp.*, 256 Ark. 905, 511 S.W.2d 166 (1974), a different, correct and more equitable result would have been reached.

This controversy centers around the definition of "book value" as that term is employed in the termination provision of the parties' employment agreement. That provision reads as follows:

In the event the employee is also a shareholder of the employer, termination of this agreement shall not affect any rights the employee may have with regard to the stock of the employer which he owns, provided, however, that, upon termination of this agreement by either party, the employee hereby covenants and agrees that *the employer may make a 100% redemption of such employee's stock at the then book value of the stock.* [Emphasis supplied.]

The majority court has taken the position that the term "book value" is not ambiguous and, therefore, appellant was not entitled to present parol testimony to show the intent of the parties. On this point, I disagree.

Admittedly, the term "book value" normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities. Moreover, I am quite aware that generally accepted accounting principles normally require that "book value" be based on an accrual basis, which means that accounts receivable would be included when determining the value of a corporation's stock. However, in the instant case, the facts clearly reflect that the appellant used a cash basis of accounting and, therefore, never included an accounts receivable amount

when computing the value of the company stock. Given these facts, the term of "book value" as employed by the parties in their agreement, was susceptible to two separate or possible meanings. This being so, I believe a latent ambiguity exists, and the trial court should have allowed the appellant the opportunity to present parol testimony to explain what the parties intended by the term "book value" as it was used in the parties' agreement. See *Ellege* v. *Henderson*, 142 Ark. 421, 218 S.W. 831 (1920). See also, 3A C.J.S. *Ambiguity*, at 409-410 (1973).[1]

If I am correct that a latent ambiguity exists, I am then met with the well-settled rule that the language used in a contract will be resolved against the drafter of the agreement, *i.e.*, in this case, the appellant. This rule must, however, give way in this cause to other rules of construction in our attempt to determine the parties' intent when they entered this employer/employee relationship. To this effect, see *Les-Bil, Inc.* v. *General Waterworks Corp., supra.* Here, the parties' agreement employed the technical term "book value." As noted in *Les-Bil,* our cases clearly recognize that when a technical term is used in a sense other than the ordinary meaning of the word, testimony is admissible to explain the meaning of the term and the question may be submitted to the trier of fact to determine in what sense the term was used. The court in *Les-Bil* further stated:

> In determining the intention of the parties at least equal regard must be given to the rule that, in spite of the fact that words in a contract are generally to be given their usual and ordinary meaning, words of art or words connected with or peculiar to a particular trade, profession or occupation are to be given the significa-

---

[1]The term "latent ambiguity" in Corpus Juris Secundum is defined to mean "an ambiguity which arises not upon the words of the instrument, as looked at in themselves, but upon those words when applied to the object or subject which they describe. It is one which does not appear on the face of the language used or the instrument being considered or when the words apply equally to two or more different subjects or things, as where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or evidence aliunde creates a necessity for interpretation or a choice among two or more possible meanings."

tion attached to them by experts in such art or trade, profession or occupation unless it appears that they were used in a different sense. If, in reference to the subject matter of a contract, words have, through usage acquired a meaning different from their usual meaning, the parties must be taken to have used them in their peculiar meaning.

Although I am convinced that a clear ambiguity arose due to the parties' use of the term "book value," the trial court refused to allow appellant to introduce parol evidence to show what the parties meant by the use of that term. For instance, I believe the trial court erred in excluding the testimony of Julia Short, the business manager of the appellant at the time appellee was employed. Ms. Short testified that she had advised appellee that the purchase of shares of stock did not include accounts receivable, and it was not to be included in evaluating the shares when there was a termination of employment. Moreover, she informed him that the salary he was paid was from the accounts receivable, and it was for this reason appellee would receive no accounts receivable when he terminated employment. None of this testimony by Ms. Short was considered by the trial judge when he construed the parties' agreement and decided the shares were worth over $9,000. Ms. Short's testimony was actually bolstered by the testimony given by appellee. At trial, appellee admitted that Dr. Beard, one of appellant's physicians and shareholders, explained that it was easy to buy into the appellant corporation because "You don't pay much for your stock and as a consequence you didn't take much out for your stock when you left." Appellee testified that Dr. Beard informed him that the stock was not worth much. He also could not remember whether Julia Short explained to him that the appellant corporation used a cash basis of accounting.

Considering the rules of construction applicable to this case, I believe the trial court clearly erred in excluding the testimony of Ms. Short as well as other parol evidence indicating that the term "book value," as employed by the parties' agreement, was not meant to include the corporation's accounts receivable. At the very least, I believe this

matter should be remanded to the trial court for its consideration of that parol evidence which it did not consider when reaching its decision. However, my stronger belief is that this Court should, in reviewing this cause *de novo*, find that the parties did not intend the term "book value" to include accounts receivable. If this Court had done so, the uncontradicted evidence is that appellant's stock actually possessed a negative value rather than the inflated amount awarded by the trial court. Since appellee paid only $300 for the shares initially, the finding and holding I urge is certainly more reasonable and fair in view of the fact he owned the shares less than one year and all the evidence leads to the conclusion that the shares were sold him at a price which was computed without any reference to accounts receivable.

CRACRAFT and CORBIN, JJ., join in this dissent, except CORBIN, J., would remand to the trial court for its consideration of the parol evidence which was excluded at the trial of this cause.