Robert L. BONE, Appellee,

v.

REFCO, INC., f/k/a Ray E. Friedman & Company, Appellant.

Robert L. BONE, Appellant,

v.

REFCO, INC., f/k/a Ray E. Friedman & Company, Appellee.

Nos. 84–1519, 84–1574.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1984.

Decided Sept. 25, 1985.

G. Alan Wooten, Oscar N. Person, Fort Smith, Ark., for appellant.

William H. Sutton, Little Rock, Ark., for appellee.

Before BRIGHT, Senior Circuit Judge, McMILLIAN and BOWMAN, Circuit Judges.

BRIGHT, Senior Circuit Judge.

Robert Bone commenced this diversity action against Refco, Inc., claiming damages for breach of contract. Refco filed a counterclaim seeking to recover debit balances on various commodities trading accounts which it alleged Bone owned or controlled. The jury awarded Bone $909,-482.96 on his claim and Refco $980,002.92 on its counterclaim. Both parties appeal.

Bone asserts that he is entitled to prejudgment interest on a portion of the amount awarded to him and that Refco was improperly awarded prejudgment interest. In its cross-appeal, Refco asserts, *inter alia,* that the magistrate, who served as the trial judge by consent of the parties under 28 U.S.C. § 636(c) (1982), erred in denying its motion for judgment n.o.v. and erred in the conduct of the trial by permitting oral testimony concerning the terms and meaning of various agreements between the parties in violation of the parol evidence rule. For the reasons stated below, we affirm the judgment allowing Refco prejudgment interest on its counterclaim, and vacate the judgment on Bone's claims, which we remand for further proceedings consistent with this opinion.

## I. BACKGROUND.

On February 18, 1977, Bone entered into an agreement with Refco, a Chicago-based commodity futures trading company, in which he agreed to establish an office in Springdale, Arkansas under Refco's name to solicit customers to engage in commodity futures trading and to serve as manager of the Springdale branch office. The terms of this agreement, which were set forth in a letter from Refco to Bone, provided, among other things, that Refco would pay the branch office manager interest on commissions held by Refco and that it would use its "best efforts" to purchase a specified number of feeder cattle at a specified spread for Bone's account.

In December 1977, the Chicago Board of Trade took disciplinary measures against Bone and required Refco to remove Bone from any position with supervisory duties. In March 1978, Bone and Refco entered into a second agreement, a standard form Account Executive Agreement, governing Bone's employment with Refco as an account executive, *i.e.,* a salesman, in the Springdale office. The terms of this agreement obligated Bone to guarantee the accounts of his customers and to reimburse Refco for any losses it sustained as a result of any of Bone's customers' accounts fall-

ing into a debit position. The agreement also contained a merger clause stating that it constituted the entire agreement between the parties.

In the fall of 1979, Bone and numerous Refco customers (whose accounts were traded by Bone) sustained substantial losses in the commodities futures market. Pursuant to the terms of the guarantee provision in the 1978 agreement, Refco sued Bone to collect then existing deficits in several of these customers' accounts and in Bone's personal account. Bone contended that Refco and its president, Thomas Dittmer, were actually responsible for the trading losses. On December 1, 1979, Bone, Dittmer, and Refco entered into a settlement agreement in which Refco agreed to dismiss its pending suit against Bone. In exchange, Bone agreed to execute two promissory notes totalling $1,500,-000 to Refco and to pay Refco a sum of $209,951.61, which the parties agreed represented "the amounts presently held by Refco for the account of Bone for unpaid commissions." The settlement agreement also provided that Dittmer and Refco would indemnify Bone for any losses, costs or expenses—including attorneys' fees—which Bone might incur because of lawsuits brought by Refco customers to recover their losses.

Shortly thereafter, the Chicago Mercantile Exchange (CME) took further disciplinary actions against Bone. As a result, Bone was suspended, in January 1980, from engaging in any brokerage or sales activity for a period of three years. He apparently continued, however, to run the Springdale office until Refco closed that office in July 1981.

In September 1981, Bone filed the present action alleging that Refco had breached the parties' February 1977 letter agreement by failing to pay him interest (totalling $720,844.39) on the reserve commissions, and by failing to use its best efforts to purchase any feeder cattle for his account between February 1977 and July 31, 1981 (which he alleged would have shown a profit of $428,657.62). In addition, Bone sought to recover $76,267.96 in attorneys' fees, pursuant to the 1979 settlement agreement, which he allegedly incurred as a result of his involvement in lawsuits brought by various former Refco customers against Refco to recover their losses in the 1979 live cattle futures market. Bone's total claim amounted to $1,225,769.97. Refco denied liability, asserting that Bone's claims for interest and lost profits on feeder cattle were barred by the 1979 settlement agreement and the 1978 Account Executive Agreement. It also asserted that Bone had not tendered to it written statements of the attorneys' fees he sought to recover, and that, consequently, it had not breached its agreement to pay them.

Refco also filed a counterclaim alleging that Bone had breached the terms of the 1978 Account Executive Agreement by failing to reimburse it for losses it suffered as a result of debit balances in various commodities trading accounts which Bone had guaranteed. It sought to recover the total amount of these debit balances, $816,-064.53, along with prejudgment interest on that sum in the amount of $163,938.39 (computed at the rate of six percent from the date each debit balance was incurred until the date of the trial) for a total of $980,002.92.

The jury returned a general verdict awarding Bone $909,482.96 and Refco its entire claim of $980,002.92. Both parties filed motions for judgment n.o.v. or for a new trial. The magistrate denied all post-trial motions. Both parties now appeal.

## II. PREJUDGMENT INTEREST ON REFCO'S COUNTERCLAIM.

Bone does not challenge the jury's verdict awarding Refco $816,064.53 on the debit account balances. His sole contention with respect to Refco's award is that the magistrate erred by allowing Refco to recover prejudgment interest on its counterclaim.

State law governs awards of prejudgment interest in diversity actions. *Kinsella v. Leonard*, 415 F.2d 574, 578

(10th Cir.1969); *see Red Lobster Inns v. Lawyers Title Insurance Corp.,* 656 F.2d 381, 386 (8th Cir.1981). The Arkansas Supreme Court has held that prejudgment interest must be allowed when the measure of damages is capable of exact determination in amount at the time of the injury. *See, e.g., Hopper v. Denham,* 281 Ark. 84, 661 S.W.2d 379, 383 (1983); *Wooten v. McClendon,* 272 Ark. 61, 612 S.W.2d 105, 106 (1981); *Lovell v. Marianna Federal Savings & Loan Association,* 267 Ark. 164, 589 S.W.2d 577, 578 (1979).

■ At trial, Bone admitted liability for several of the accounts with debit balances totalling some $400,000, but denied liability for the remaining debit account balances Refco sought to recover. He contends that because his ultimate liability to Refco was not established until the conclusion of the trial, the magistrate erred, under Arkansas law, in allowing Refco to recover prejudgment interest on its claims.[1]

We disagree. The debit balances here were for a sum certain fixed at the time of injury or loss. Indeed, these debit balances are a paradigmatic example of the type of damages which are capable of an exact determination both in time and as to amount.

Bone's contention that his liability to Refco was not established until the conclusion of the trial is true, but that does not preclude Refco from recovering prejudgment interest. Bone's argument misperceives the nature of the requirement under Arkansas law that damages be capable of exact determination at the time of injury. The requirement is not that ultimate liability be established at the time of the injury, but rather that the damages be essentially liquidated at that time. *Lovell* presented an analogous situation that is instructive in this regard.

In *Lovell,* the issue was whether prejudgment interest should have been awarded on three certificates of deposit. Litigation was required to determine who owned the CD's, but the CD's had an exact determinable value. Consequently, the court held that prejudgment interest should have been awarded to the owner of the CD's, even though litigation was required to determine ownership. Similarly, even though the ultimate determination of Bone's liability for each of the accounts Refco alleged he was liable for was a question of fact for the jury, the amount of the debit balance in each account was capable of exact determination at the time it was incurred. Accordingly, Bone's argument on this ground must fail.[2]

---

**1.** Bone also contends that the magistrate erred in submitting to the jury an exhibit reflecting prejudgment interest on the ground that that permitted the jury, rather than the court, to decide whether to award Refco prejudgment interest. Whether to award prejudgment interest is, as Bone notes, a question of law, not a question of fact for the jury. *Hopper v. Denham,* 661 S.W.2d at 383; *Wooten v. McClendon,* 612 S.W.2d at 106. Contrary to Bone's assertion, however, the magistrate did not allow the jury to decide whether to award prejudgment interest on Refco's claim. Rather, the magistrate directed the jury that if it found in favor of Refco on any of the debit account balances Refco claimed against Bone, it should award prejudgment interest on that amount at a rate of 6%. A binding instruction to the jury decides an issue as a matter of law.

**2.** Bone also contends that the magistrate erred in allowing Refco to recover prejudgment interest on the account debit balances because CME rules and regulations prohibit member brokers from charging interest on customer debit bal-

ances until the broker has written the debit balance off its books. The sole evidence introduced by Bone on this point was the deposition testimony of Wendell Holman, a former Refco executive. The magistrate denied Bone's post-trial motion to strike Refco's recovery of prejudgment interest on this ground, stating that he was unable "to evaluate" Holman's testimony that the CME regulations prohibited Refco from receiving prejudgment interest on these account debit balances because "[t]he specific provisions of these 'rules and regulations' were never made known to this Court."

Assuming *arguendo* that the CME's private regulations could bar the award of prejudgment interest, we think that Bone, the resisting party, bore the burden of introducing into evidence certified copies of the CME rules and regulations upon which it relied. The magistrate acted within his discretion in declining to strike the award of prejudgment interest to Refco solely on the basis of deposition testimony which did not refer to the specific language of the relevant regulations and which suggested that those very regulations had since been changed.

Alternatively, Bone contends that even if Refco is entitled to prejudgment interest, the magistrate erred in allowing Refco to recover interest on its entire claim. He asserts that the magistrate should have applied the "interest on the balance" rule under which prejudgment interest would be awarded only on the net difference between his claim and Refco's counterclaim after disallowing their separate claims for prejudgment interest. Bone relies on *Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*, 416 F.2d 207 (8th Cir.1969) (affirming trial court's application of interest on the balance rule), and argues that equity and fairness require that the interest on the balance rule apply here.

We disagree. The trial court in *Ralston Purina* applied the interest on the balance rule rather than the interest on the entire claim rule solely as an equitable measure necessitated by the plaintiff's bad faith in refusing to recognize its obligations to the defendant. In this case, however, Refco has not acted in bad faith, nor are any of the extraordinary factors justifying application of the interest on the balance rule in *Ralston Purina* present. We note that Refco's counterclaim was liquidated in nature while Bone's claim was essentially unliquidated. Moreover, Refco's claim for the debit balances in customer accounts was independent of and unrelated to Bone's claim for interest on commissions, attorneys' fees, and lost profits on feeder cattle. These facts call for application of the interest on the entire claim rule, *see Ralston Purina*, 416 F.2d at 212; *Socony Mobil Oil Co. v. Klapal*, 205 F.Supp. 388, 392–93 (D.Neb.1962), and the magistrate correctly applied this standard. The mere fact that Bone had also asserted a claim against Refco does not require mutual set-off and thereby defeat Refco's right to prejudgment interest on its claim. *Ray E. Fried-*

*man & Co. v. Jenkins*, 738 F.2d 251, 254 (8th Cir.1984); *Socony Mobil Oil Co.*, 205 F.Supp. at 393. Accordingly, we affirm the award of prejudgment interest to Refco on its counterclaim.[3]

## III. REFCO'S CROSS-APPEAL ON BONE'S RECOVERY.

In its cross-appeal, Refco contends that the magistrate erred in denying its motion for judgment n.o.v. as to all of Bone's claims. Alternatively, it seeks a new trial on Bone's claims, asserting that the magistrate erred in admitting parol evidence on Bone's claim for lost profits, erred in admitting exhibits relating to Bone's claims for interest and lost profits, and erred in instructing the jury on Refco's affirmative defenses. We find the parol evidence issue dispositive, and we conclude that the magistrate erred in admitting certain parol evidence.[4] Accordingly, we must vacate the judgment and set aside the jury verdict on Bone's claims and remand this case for a new trial on those claims.

### A. Lost Profits on Feeder Cattle.

Bone's claim for lost profits on feeder cattle, like his claim for interest on commissions, arises under the 1977 letter agreement which provided, in pertinent part:

In addition Red, we have agreed to use our best effort to buy for your account up to 2,500 head of feeder cattle at a price which will provide an approximate spread of 5.50/CWT between the feeder cattle and the delivery option of the live cattle futures price at time of purchase. Once we reach the 2,500 head level we will continue on a best effort basis to keep the number of head on feed for your account at this level on a continuous basis.

---

**3.** Bone also contends that the magistrate erred in denying his request for prejudgment interest on a portion of his jury award which he would allocate to his claim for lost profits. In light of our disposition vacating the judgment on Bone's claims, we need not reach this issue. The trial judge can reconsider this issue should it arise on retrial.

**4.** In light of this disposition, we deem it unnecessary to discuss the issues relating to the jury instructions and the admissibility of trial exhibits.

In order to make out a prima facie case on his claim that Refco breached its obligation under this paragraph, Bone had to establish that cattle were available at the terms specified in the agreement and that Refco failed to use its "best efforts" to obtain for Bone up to 2,500 head of feeder cattle and maintain that level on a continuous basis.

The magistrate determined that this contractual language was ambiguous and allowed parol evidence in the form of testimony concerning the parties' understanding of this provision. Bone testified that the parties understood this provision to mean that Refco would use its "best efforts" to supply Bone with 2,500 head of hedgeable feeder cattle on each "turn."[5] Bone further testified that the reference in the contract to a spread of approximately $5.50/CWT between the price of feeder cattle and the live cattle futures price related only to that specific point in time and that the parties intended simply that Bone be supplied with feeder cattle that could be hedged.

Refco contends that the magistrate committed reversible error by allowing Bone to testify to his understanding of the meaning of the terms in the 1977 agreement relating to Refco's obligations to supply Bone with feeder cattle.

■ We agree. Certainly, the terms of the agreement relating to the feeder cattle—stating that Refco would use its "best effort" to provide Bone on a "continuous basis" with 2,500 head of feeder cattle with an "approximate spread" of $5.50/CWT be-

tween the purchase and selling price—were unprecise and created patent ambiguities. Where a patent ambiguity exists in the language of a contract, extrinsic evidence in the form of oral testimony is admissible to assist the jury in determining the intent of the parties. See Saltzman-Guenthner Clinic, Ltd. v. Burnett, 5 Ark.App. 56, 632 S.W.2d 441, 443 (1982). The Arkansas parol evidence rule does not bar the admission of oral testimony offered to explain the ambiguity and show the parties' intent, Ark.Stat.Ann. § 85–2–202 (1979); Peevy v. Bell, 255 Ark. 663, 501 S.W.2d 767, 768 (1973), but it does bar the admission of oral testimony that contradicts or varies the written terms. Id. Farmers Cooperative Association v. Garrison, 248 Ark. 948, 454 S.W.2d 644, 646 (1970).

Although the ambiguity in the provision calling for an "approximate spread of 5.50/CWT" would permit testimony of the parties explaining what they intended the parameters of the spread to be, Bone's testimony that the figure was irrelevant and that the parties intended simply that he would be provided cattle that could be hedged contradicted an express, albeit somewhat loose, term of the agreement that set forth a target hedge margin. Thus, it was a violation of the parol evidence rule for the magistrate to admit that testimony to alter the terms of the written contract.[6]

■ All of the evidence Bone introduced at trial to establish the availability of feed-

---

**5.** A "turn" in the cattle feeding industry refers to the cycle in which a feedlot takes in unfinished cattle, brings them to market weight, and then ships them out for slaughter. Although the length of the cycle varies, testimony in the record indicated that a feedlot can "turn" out approximately two units (the feed-lot capacity) of cattle a year.

**6.** In asserting that the "approximate 5.50/CWT spread" term meant only that Refco was to supply Bone with feeder cattle that would hedge, Bone also relies on testimony given by Dittmer who also stated that the $5.50 figure referred only to that particular time frame and that he understood the agreement to mean that Refco was to use its best efforts to buy feeder cattle for Bone that could be hedged. To the

extent that Bone may be suggesting that the court properly admitted this testimony to show that the express terms in the written agreement did not reflect the parties' actual understanding, the parol evidence rule would still operate to exclude the testimony. See Farmers Cooperative Association v. Garrison, 454 S.W.2d at 647. The parol evidence rule is a rule of substantive law which provides that when an agreement is reduced to writing, the writing becomes the agreement and all prior negotiations and verbal understandings are merged into the written agreement. Id. at 646–47; see also Saltzman-Guenthner Clinic, Ltd. v. Burnett, 5 Ark.App. 56, 632 S.W.2d 441, 443 (1982); Restatement (Second) of Contracts § 213 comment a (1979).

er cattle to Refco through Dittmer's feed-lot operations, and his lost profits attributable to Refco's alleged breach of contract[7] related to Bone's contention that the agreement merely required Refco to provide him with feeder cattle that could be hedged, regardless of the margin of the hedge, a contention which we reject. None of the testimony indicated that feeder cattle were available that could be hedged at an approximate $5.50/CWT spread, nor is there any other evidence in the record which indicates that such cattle were available. Thus, the erroneous admission of this parol evidence resulted in Bone's claim for lost profits being improperly submitted to the jury. The admission of this parol evidence therefore constitutes reversible error. Thus, we vacate the judgment in Bone's favor on his claim for lost profits.[8]

The magistrate submitted all three of Bone's claims to the jury with a general verdict form. The jury returned a general verdict for Bone in the amount of $909,482.96. That the jury awarded Bone some damages on the lost profits claim is clear; the damages sought by Bone on his other two claims totalled only $797,121.35. Because the jury returned a general verdict, however, we cannot determine how much of the award was predicated on the lost profits claim which should not have been submitted to the jury. Had Bone's claims been submitted on special verdicts, we could simply have stricken the award on the lost profits claim and affirmed the judgment on the other claims.[9] *Jones v. Miles*, 656 F.2d 103, 108 (5th Cir.1981). The rule is that when one of several claims has erroneously been submitted to the jury, a general verdict cannot stand. *Doherty v. American Motors Corp.*, 728 F.2d 334, 344 (6th Cir.1984); *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1038–39 (8th Cir.) (quoting *Morrissey v. National Maritime Union*, 544 F.2d 19, 26–27 (2d Cir.1976) ), *cert. denied*, 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 174 (1978). Accordingly, in light of the general verdict made in this case, and our holding that Bone's claim for lost profits was improperly submitted to the jury, we must vacate the judgment on

7. As proof of the availability to Refco of hedgeable feeder cattle, Bone introduced into evidence close-out sheets from Dittmer's various cattle feeding operations which provided detailed information concerning those operations, including the date of purchase, the number of cattle purchased (lot) and acquisition cost, the feeding and feedlot charges, the date sold and proceeds of the sale, and the profit or loss on each lot of cattle. Bone then produced an expert witness who testified that he had examined these "close-out sheets" and, disregarding the profit or loss figures but figuring in interest charges, had designated which lots of cattle were hedgeable. As proof of his lost profits due to Refco's alleged breach of contract, Bone then produced a bookkeeper who testified that she had gone through these records and, using the lots of cattle which had been designated as hedgeable, totalled up lots of cattle until she reached 2,500. By this procedure she constructed five turns of 2,500 head of cattle which Refco allegedly could have supplied to Bone between April 1977 and June 1980. She then calculated a gross profit figure based on the actual profit or loss figure shown for each lot of cattle on the close-out sheets. From this figure, she deducted appropriate interest charges to arrive at a net profit figure—$428,657.62—which Bone maintained represented his lost profits due to Refco's alleged breach.

8. We decline, however, on the basis of the record before us, to hold that Refco is entitled to judgment on Bone's claim for lost profits as a matter of law. Although Refco defended against this claim by arguing that it was excused from performance because changes in the interest rates and futures market made it impossible to obtain feeder cattle which could be hedged at the spread specified in the agreement, there is no positive proof that such cattle were not available. Because our holding vacating Bone's judgment requires a remand for a new trial on his claims for interest on commissions and attorneys' fees (*see infra*), we see no compelling reason to preclude Bone from also presenting this claim again, provided he can produce evidence that cattle were available to Refco which would have produced the requisite approximate hedge margin specified in the agreement.

9. As one commentator noted:
 The general verdict is either all wrong or all right, because it is an inseparable and inscrutable unit. A single error completely destroys it. But the special verdict enables errors to be localized so that the sound portions of the verdict may be saved and only the unsound portions be subject to redetermination through a new trial.
 Sunderland, *Verdicts, General and Special,* 29 Yale L.J. 253, 259 (1929).

Bone's claims, set aside the general verdict award to Bone, and remand all these claims for a new trial.[10] *See Jones v. Miles,* 656 F.2d at 108; *Mueller,* 573 F.2d at 1039–40.

Because we remand this case for a new trial on Bone's claims, we think it incumbent upon us to address Refco's various contentions that it is entitled to judgment as a matter of law on each of Bone's claims in order to assist the parties and the trial court in framing the case for a new trial.

### B. Interest on Reserve Commissions.

#### 1. Did the 1978 agreement discharge the 1977 agreement?

■ Bone's claim for interest on reserve commissions arises under the 1977 letter agreement.[11] In March 1978, after the Chicago Board of Trade required Refco to remove Bone from any supervisory position, Bone signed a form Account Executive Agreement. This agreement, which governed Bone's brokerage (sales) activity for Refco, contained a merger clause.[12] Refco asserts that the merger clause in the 1978 agreement indicates that the parties intended the 1978 agreement to be an integrated agreement which superseded the 1977 agreement and discharged its provisions. Thus, Refco contends that it is entitled to judgment as a matter of law on

Bone's claims for interest on commissions and lost profits.

We disagree. Clearly, when an integrated agreement exists, the Arkansas parol evidence rule bars the introduction into evidence of any prior agreement to contradict the terms of the agreement. Ark.Stat. Ann. § 85–2–202 (1961); *see Farmers Cooperative Association v. Garrison,* 248 Ark. 948, 454 S.W.2d 644, 647 (1970); *R.G. Varner Steel Products, Inc. v. Puterbaugh,* 233 Ark. 953, 349 S.W.2d 805, 807 (1961). It is equally clear, however, that under the parol evidence rule, a completely integrated agreement does not discharge prior agreements that do not fall within its scope, *see Farmers Cooperative Association,* 454 S.W.2d at 647–48; Ark.Stat.Ann. § 85–2–202(b); Restatement (Second) of Contracts § 213(2) & comment c (1979), and a partially integrated agreement does not discharge prior agreements that supplement, but are not inconsistent with, the integrated agreement. *Farmers Cooperative Association,* 454 S.W.2d at 648; Ark. Stat.Ann. § 85–2–202; Restatement (Second) of Contracts § 213(1).

A plain reading of the 1977 and 1978 agreements indicates that they are independent of each other. The 1978 agreement

---

**10.** Although the submission of a special verdict is discretionary with the trial judge, *Johnson v. Richardson,* 701 F.2d 753, 758 (8th Cir.1983); *see* Fed.R.Civ.P. 49(a), in a case such as this involving either multiple claims or multiple theories where one of the claims is improperly submitted to the jury, the use of a special verdict form may enable an appellate court to salvage the portions of the verdict on the claims or theories properly submitted, thereby foregoing the unnecessary inconvenience, expense, and burden on the judicial system and the parties that results from having to retry the entire case. *Jones v. Miles,* 656 F.2d at 108; *Mueller,* 573 F.2d at 1038 n. 13.

**11.** Under that agreement, Refco was to pay 60% of the total gross commissions generated from sales of commodities futures contracts to the Springdale office each month. Refco retained the other 40%. The 60% paid to the Springdale office was allocated between the sales agents and the branch office manager according to the individual deal each sales agent negotiated with the branch office manager. (Testimony at trial indicated that the split typically gave the sales

agent 45% and the branch manager 15%.) The agreement authorized the branch office manager to leave a portion of these monthly commissions on reserve with Refco. These "reserve" or "excess" commissions were treated as a loan from the branch office manager to Refco, on which Refco was obligated, pursuant to this agreement, to pay interest either at a rate of 1½% over the then current prime lending rate at Continental Illinois National Bank in Chicago, or at the short-term treasury bill rate, depending on how Refco actually invested these funds.

**12.** The merger clause stated:

This instrument together with the REFCO Branch Office Manual, as amended from time to time, incorporated herein by reference thereto contains the entire Agreement of the parties. It may not be changed orally, but only by an Agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

was simply the standard form contract Refco used for all of its commodities brokers and concerned only Bone's employment by Refco as a commodities broker. The subject matter of the 1978 agreement—daily trading activities, solicitation of customers—was wholly unrelated to the subject matter of the February 1977 letter agreement (which was individually negotiated between Refco and Bone) which dealt with the establishment of a Refco branch office in Springdale under Bone's control. These two agreements are such that one would not expect the parties to incorporate the terms of the earlier agreement or make reference to its existence in the later form contract. We are of the opinion that, taken together, the two agreements embody the entire written agreement between Bone and Refco. Accordingly, we hold that Refco is not entitled to judgment on these claims on this ground. *See Lemm v. Sparks,* 230 Ark. 105, 321 S.W.2d ,388, 392 (1959) (giving effect to earlier contract despite merger clause in later contract where subject of agreements differed).

### 2. Did the 1979 Settlement Agreement settle Bone's claim for interest on commissions?

After Bone·and several of his customers sustained substantial trading losses in the live cattle futures market in late 1979, Refco instituted a suit against Bone to collect then existing deficit balances in several accounts, which Bone had undertaken in the 1978 agreement to guarantee. Refco and Bone subsequently entered into a settlement agreement on December 1, 1979. In exchange for Refco's agreement to dismiss its pending suit, Bone agreed to pay Refco a total of $1,709,915.61, $209,915.61 of which the parties agreed reflected the amount held by Refco in Bone's unpaid commissions account.

Refco asserts that Bone's claim for interest is barred as a matter of law by the doctrines of settlement and account stated. Refco contends that Bone's agreement to pay Refco $209,915.61 constitutes an account stated [13] of the balance in the reserve commission account which binds both Refco and Bone. Refco argues that because the law favors settlements, they must be construed to resolve all the issues that may fairly be determined to have been within the contemplation of the parties making the settlement. *See Burke v. Downing Co.,* 198 Ark. 405, 129 S.W.2d 946 (1939). Consequently, Refco argues that the settlement agreement should be construed as settling the entire prior course of dealings between Refco and Bone, thereby precluding Bone from recovering interest on the reserve commissions [14] as a matter of law.

We disagree. In interpreting a contract, a court must give effect to the intent of the parties. *See Les-Bil, Inc. v. General Waterworks Corp.,* 256 Ark. 905, 511 S.W.2d 166, 170 (1974). In a written contract, this means that a court must give effect to the intent manifested by the plain meaning of the language used by the parties. *Id.* However, extrinsic or parol evidence is admissible to explain or help ascertain the intent of the parties when ambiguity, either patent or latent, exists in the written agreement. *C. & A. Construction Co. v. Benning Construction Co.,* 256 Ark. 621, 509 S.W.2d 302, 303 (1974); *accord Press Machinery Corp. v. Smith R.P.M. Corp.,* 727 F.2d 781, 784 (8th Cir.1984) (applying Missouri law); *United States v. Haas & Haynie Corp.,* 577 F.2d 568, 572 (9th Cir. 1978) (applying general contract principles). Whether an ambiguity exists is a question of law for the court. *C. & A. Construc-*

---

**13.** Under Arkansas law, an "account stated" is "an agreement between two parties who have had previous transactions of a monetary character that all of the items of the account representing such action are true and that the balance struck is correct, together with a promise * * * for the payment of such balance." *Hogue v. Jennings,* 252 Ark. 1009, 1010, 481 S.W.2d 752, 753 (1972).

**14.** At trial, Refco also took the position that Bone's claim for lost profits had been settled. On this appeal, however, Refco presses this argument only with respect to Bone's claim for interest on commissions.

*tion Co.*, 509 S.W.2d at 303; *accord Press Machinery Corp.*, 727 F.2d at 784. In determining whether an agreement is ambiguous, "it is proper to examine the disputed language in the context of the entire agreement. [citations omitted] And evidence relating to prior negotiations and other circumstances surrounding the making of the contract are [sic] to be considered * * *." *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 387 (8th Cir. 1969); *accord Press Machinery Corp.*, 727 F.2d at 784–85.

■ The magistrate determined that the settlement agreement, in particular the provision stating that the $209,915.61 figure "constitut[ed] the amounts presently held by Refco for the account of Bone for unpaid commissions," contained a latent ambiguity as to the scope of what the parties intended to settle. Consequently, he permitted extrinsic evidence in the form of testimony by the parties as to what they intended to settle by this agreement.

We see no error in the determination that the agreement was ambiguous on this question. Bone and Bruce Strange, who was also a party to the settlement agreement and who conducted negotiations on behalf of Bone, both testified that the parties intended to settle only Bone's claim for commissions owing to him at that time, and that the settlement agreement did not relate to the interest owed on the commissions. Although this testimony was self-serving, it is supported by a reading of the entire settlement agreement. We note that the language in the disputed clause does not, by its own terms, purport to include the *interest* that Refco had agreed to pay on the reserve commissions. Furthermore, the introductory "whereas" clauses in the settlement agreement reciting the history and nature of the disputes at the core of the agreement indicate that the parties intended to settle only the claims they had

against each other arising from the substantial trading losses sustained by Bone and various Refco customers in the live cattle futures market and Refco's losses caused by the debit balances in the accounts controlled by Bone. The agreement explicitly referred to Bone's employment as a commodities broker, but it contained no reference to his status as office manager under the terms of the 1977 agreement, and it is under that agreement that his claim for interest on the reserve commissions arises.

■ When the court determines that ambiguity exists, resolution of the ambiguity presents a question of fact for the jury. *Press Machinery Corp.*, 727 F.2d at 784; *Fitch v. Doke*, 532 F.2d 115, 117 (8th Cir.1976). Although another jury might determine that the parties did intend to settle Bone's claim for interest on reserve commissions, the point remains that this is a jury question; we simply cannot say, on the basis of the record before us,[15] that Refco is entitled to judgment as a matter of law on this claim on the ground that the parties have previously settled it.

### 3. Was Bone the "branch office manager" to whom the interest on reserve commissions was owed?

Next, Refco notes that the 1977 letter agreement provides that the interest on reserve commissions was to be paid to the branch office manager. Refco concedes that Bone was the branch office manager from the time he commenced his association with Refco in March 1977 until December 1977 when the Chicago Board of Trade required Refco to remove Bone from any supervisory capacity as part of certain disciplinary measures taken against Bone. At trial, Bone testified that Bruce Strange and Steve Johns served in the position of office manager from December 1977 until the of-

---

15. The jury's determination that this claim was not settled is not without support in the record. For example, the jury could infer from the fact that Refco extended credit to Bone in May 1980 —five months after the date of the settlement agreement—against interest Bone owed to Ref-

co on a 1978 note by applying a portion of the interest it owed Bone on the reserve commissions, that Refco did not assume that Bone's claims or right to interest on the reserve commissions had been settled.

fice closed in July 1981. Refco asserts that in light of Bone's own testimony that other personnel had acted as and assumed the title of "office manager" from December 1977 on, Bone has no claim, as a matter of law, to any interest on the reserve commissions earned after December 1977, because the agreement expressly stated that the interest was to be paid to the branch office manager.

 We disagree. Under the terms of the 1977 agreement, Bone was entitled to receive interest on the reserve commissions held by Refco as long as he was branch office manager. Because the agreement referred to the position "branch office manager" but did not define the duties and functions of the position, a factual question arose as to what the parties intended that position to entail. *Accord Coulson Oil Co. v. Wilcox,* 12 Ark.App. 111, 671 S.W.2d 198, 199 (1984). That situation permits a court to admit parol testimony of the parties' understanding of the term and it is then left to the jury to make a determination on that question of fact. *See Press Machinery Corp., supra; Fitch v. Doke, supra.* The testimony on this issue at trial was split. Although another jury might accept Refco's position and reject Bone's, we cannot say, on the record and evidence before us,[16] that no jury could find for Bone on this issue. Accordingly, we hold that Refco is not entitled to judgment on Bone's claim for interest on reserve commissions on this ground.

Because we reject each of Refco's arguments that it is entitled to judgment on Bone's claim for interest on reserve commissions as a matter of law, Bone may present this claim again on retrial.

**C. Attorneys' Fees.**

 Refco also asserts that it is entitled to judgment as a matter of law on Bone's claim for attorneys' fees. First, Refco contends that because Bone has never presented his attorneys' statements to it for payment it has not breached its agreement to pay attorneys' fees. Bone testified that he has asked Refco to pay these fees and it has refused. We think Refco's oral refusal to pay Bone's attorneys' fees is sufficient to establish a breach of the agreement.

 Second, Refco asserts that Bone has offered no proof that the legal fees for which he claims the right to indemnity related to suits in which he was named as a defendant, which Refco contends is required by the settlement agreement. Based on the detailed billing statements Bone introduced into evidence, it appears that the attorneys' fees for which Bone sought payment were incurred in discovery-related matters in various suits falling within the scope of the indemnification agreement. Contrary to Refco's assertion, we think it immaterial that Bone may not have been named as a defendant in any of these suits because Refco agreed to indemnify Bone for "any and all loss, liability, cost or expense[17] which * * * [he] may

16. Some testimony at trial (including Bone's) indicated that Refco removed Bone from the position of "branch office manager" in December 1977 as a result of disciplinary actions taken against Bone by the Chicago Board of Trade. However, Bone testified that he was always considered the Springdale branch office manager, that he actually controlled the office as long as he was associated with Refco, and that he actually supervised the various other personnel who from time to time assumed the nominal title "office manager." Testimony also established that none of the other employees were ever paid interest on the reserve commissions while they served as "office manager," and that Refco always dealt with Bone on matters concerning the Springdale office. Moreover, as noted above, in May 1980, Refco extended Bone credit against interest he owed to Refco on a 1978 note by applying a portion of the interest accrued on the reserve commissions of the Springdale office. We think that this evidence was sufficient to permit the jury to find that Bone continued to serve as branch office manager (as that position was understood by the parties when they entered into the 1977 agreement) after December 1977 and that Refco continued to perform under the 1977 agreement by treating the interest on the reserve commissions as owing to Bone.

17. The indemnity was to "include, but not be limited to, the cost of defense of any such suit or suits, or proceedings, including reasonable attorneys [sic] fees."

incur as a result of the Blair Suit or any other suit brought by parties seeking to recover losses or damages resulting from the losses sustained by Refco customers [from specified futures trading activities] * * *." Based on our reading of the settlement agreement and the evidence on the record before us, we hold that Refco is not entitled to judgment as a matter of law on Bone's claim for attorneys' fees.

## IV. CONCLUSION.

We affirm the judgment of the district court awarding Refco $980,002.92 on its counterclaim. We vacate the judgment of the district court awarding Bone $909,-482.96 on his claims, and remand for a new trial on all these claims. For the reasons stated above, we hold that Refco is not entitled to judgment as a matter of law on any of Bone's claims. Bone is free to pursue all three claims in any further proceedings, with the caveat that to make a case on his claim for lost profits, he must introduce some proof that cattle were available during this time that would satisfy the approximate hedge margin set forth in the 1977 agreement. In addition, although we have not addressed the merits of Refco's various arguments on the jury instructions issues, we think Refco's assertion that its affirmative defenses should be incorporated into the instructions respecting Bone's right of recovery is essentially well taken; if the same situation should arise again on remand, the trial court should reconsider the instructions to prevent any possibility of confusing or misleading the jury on this ground.

We add an additional comment. From our review of the record and instructions, a crucial issue bearing on liability and damages on Bone's claims for interest on reserve commissions (and possibly lost profits on feeder cattle) is whether or not Bone actually served as "branch office manager" after December 1977, when the Chicago Board of Trade directed Refco to remove Bone from any capacity as a supervisor. This question should be precisely placed before the jury by appropriate instructions and a general verdict with written interrogatories or a special verdict. *See* Fed.R. Civ.P. 49(a) and (b). Written interrogatories or special verdict forms on other issues as well may prove very useful by requiring the jury to address and decide separately the several claims for money damages made by Bone.[18]

Neither party shall recover costs on these appeals.

---

18. We add an additional observation. Given the nature of the case and the complexity of the factual background and legal issues, we suggest that this case may have been an inappropriate one for reference to a magistrate for trial by jury, notwithstanding the consent of the parties.